**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-2123**

_____

BRIAN SAWYER,

          Plaintiff - Appellee,

     v.

JIM R. ASBURY, individually and in his capacity as a Deputy
with the Wood County Sheriff's Department,

          Defendant – Appellant,

     and

WOOD COUNTY COMMISSION, a political subdivision in the State
of West Virginia,

          Defendant.

_____

Appeal from the United States District Court for the Southern
District of West Virginia, at Parkersburg.  Joseph R. Goodwin,
District Judge.  (6:10-cv-01256)

_____

Argued:  May 17, 2013              Decided:  August 13, 2013

_____

Before MOTZ and GREGORY, Circuit Judges, and Ellen Lipton
HOLLANDER, United States District Judge for the District of
Maryland, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Hollander wrote the
opinion, in which Judge Motz and Judge Gregory joined.

_____

**ARGUED:** Wendy Elizabeth Greve, PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC, Charleston, West Virginia, for Appellant.  John Hague Bryan, JOHN H. BRYAN, ATTORNEY AT LAW, Union, West Virginia, for Appellee.  **ON BRIEF:** Katie L. Hicklin, PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC, Charleston, West Virginia, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

ELLEN LIPTON HOLLANDER, District Judge:

This appeal concerns events that occurred at the Wood County Detention Center in West Virginia, while Brian Sawyer was detained following his arrest in connection with a domestic disturbance. During his detention, Sawyer sustained a broken nose after Wood County Deputy Sheriff Jim Asbury used physical force upon him. The interaction was recorded on closed-circuit video, without sound, and that video is central to the case.

As a result of the incident, Sawyer sued Asbury in federal court, pursuant to 42 U.S.C. § 1983, claiming (among other things) that Asbury's use of excessive force violated Sawyer's rights under the Due Process Clause of the Fourteenth Amendment. The jury returned a verdict in Asbury's favor. Concluding that the video clearly established Asbury's use of excessive force, the district court granted Sawyer's motion for judgment. See Sawyer v. Asbury, 861 F. Supp. 2d 737 (S.D.W. Va. 2012). In addition, the district court found that Asbury was not entitled to qualified immunity. For the reasons that follow, we affirm. [1]

---

[1] The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1367(a). Our jurisdiction is founded on 28 U.S.C. § 1291.

In October 2010, Sawyer filed suit against Deputy Asbury, in both his individual and official capacities.[2] Sawyer's Amended Complaint (JA 15) contained two claims against Asbury under 42 U.S.C. § 1983. In particular, Sawyer asserted a claim of excessive force, in violation of the Fourth Amendment, arising out of Deputy Asbury's arrest of Sawyer at his home in October 2009, and another claim of excessive force, in violation of the Fourteenth Amendment, based on Deputy Asbury's conduct at the detention center.

Following discovery, the district court granted summary judgment in favor of Deputy Asbury in his official capacity as to all counts, and in favor of Deputy Asbury in his individual capacity as to the excessive force claim arising from Sawyer's arrest. However, the court denied summary judgment with respect to the individual-capacity Fourteenth Amendment claim relating to the occurrence at the detention center.[3]

---

[2] Sawyer also sued Asbury's employer, the Wood County Commission, but the district court granted summary judgment in its favor. That ruling is not contested on appeal.

[3] On appeal, Deputy Asbury challenges the summary judgment ruling as to the Fourteenth Amendment claim to the extent that the district court denied him qualified immunity. However, a party may not "appeal an order denying summary judgment after a full trial on the merits[.]" Ortiz v. Jordan, ___ U.S. ___, 131 S. Ct. 884, 889 (2011). Accordingly, our review concerning qualified immunity is limited to the district court's rulings
(Continued)

At the trial in April 2012, the jury heard the testimony of Sawyer and Asbury, as well as Sergeant Larry D. Kearns and Lieutenant David Massey, who were at the detention center at the relevant time. In addition, the video recording was played for the jury "several times at different speeds with freeze frames on occasion." 861 F. Supp. 2d at 743.[4] At the time of the incident, Asbury was not aware of the video camera in the room. JA 171.

The evidence showed that Deputy Asbury proceeded to Sawyer's home on October 29, 2009, in response to a domestic disturbance call from Sawyer's girlfriend. Sawyer admitted that before his arrest he had consumed "a couple Klonopin" and "a couple beers." JA 115-16. While Deputy Asbury was placing Sawyer under arrest, Sawyer attempted to kick Asbury. But,

---

during trial. In undertaking this review, we look to "'the trial record, not the pleadings nor the summary judgment record.'" Id. (citation omitted).

[4] At the outset of trial, the district court gave the jury the following stipulated instruction regarding the video, JA111:

> [T]he video recording you are about to see is from a security camera that is motion-activated. As a result, the video will skip slightly and the playback will pause or be slower than real-time in parts. The security camera does not record audio, so that is not available to us.

5

Asbury "saw the kick coming" and avoided it. As a result, Sawyer struck the door of the residence. JA 208.[5]

After Asbury arrested Sawyer, Asbury put Sawyer into his police vehicle and drove him to the detention center. Both Sawyer and Asbury testified that, during the drive to the detention center, Sawyer was "running [his] mouth" to Asbury. JA 118 (Sawyer); JA 171 (Asbury). For example, Sawyer told Asbury that Asbury "was a tough guy because he put his hands on someone while they're cuffed"; claimed that Sawyer "knew where [Asbury] lived"; stated that Sawyer was "going to kick [Asbury's] ass"; and asked Asbury if "he ever wonder[s] what his wife's doing while he's out working these late hours." JA 118-19 (Sawyer); JA 171 (Asbury).[6] The parties agree that Sawyer's stream of invective continued as Sawyer proceeded into the detention center. They also agree, however, that Sawyer did not engage in any physical misconduct, such as kicking, spitting, rocking the police vehicle, or physically resisting the deputies' directives.

As reflected on the video and as described in the trial testimony, the deputies escorted Sawyer, in handcuffs, into the

_____

[5] Based on Sawyer's conduct during the arrest, he was prosecuted in West Virginia state court on charges of assaulting a police officer and pleaded guilty to that offense.

[6] Sawyer did not know Asbury's marital status. JA119. In fact, Asbury was unmarried. JA209.

processing room at the detention center. Once inside, Sawyer complied with Sgt. Kearns' directive to sit on a cement bench attached to the wall. Sawyer was then instructed to stand so that Deputy Asbury could remove his handcuffs. Again, Sawyer complied. Thereafter, Asbury directed Sawyer to face the wall and place his hands on it, so that Asbury could perform a pat-down. Sawyer complied, and Deputy Asbury conducted the pat-down. During these events, Sawyer continued his invective against Asbury, although Asbury conceded that Sawyer's demeanor was "diminished" from the hostility he displayed in the police vehicle. JA 174.

The video shows that, during the pat-down, Sawyer turned his head to look back at Asbury and to speak to him, but kept his hands on the wall. All three deputies characterized Sawyer's action in turning his head as a "target glance," which the deputies described from their training and experience as a "danger cue," indicating (in Sgt. Kearns' description) that the suspect is "looking back to see the position of the officer, or what the officer might have, or what the officer's doing in preparation for some kind of an act against the officer." JA 206; see also JA 229; JA 255. Nevertheless, Sawyer did not take any physically aggressive action toward the deputies. And, despite the "target glance," the deputies did not place Sawyer back in handcuffs.

7

After Asbury completed the frisk, Sawyer again sat on the cement bench. JA 176. However, Sawyer crossed his legs and arms, a posture that Asbury and Sgt. Kearns both regarded as "defiant." JA 176; JA 229. It is undisputed, and readily apparent from the video, that while Sawyer was seated on the bench and Asbury stood directly in front of him, the two engaged in a heated verbal argument for about thirty seconds. The other deputies observed the events from a distance of a few feet.

Sawyer and Asbury were gesticulating with their hands, and both admitted that they were using "abrasive" and inappropriate language. JA 179. Asbury claimed that during this exchange he told Sawyer, three times, to stand so that he could be fingerprinted and photographed, but Sawyer did not do so, instead sitting back with his arms and legs crossed. Asbury is seen on the video pointing repeatedly with his right hand at his own left chest, in the area of his badge. The parties agree that around this time, Sawyer stated that he would "take [Asbury's] badge off [his] chest and shove it up [his] ass." JA 178.

At this point, the video shows that Deputy Asbury lunged at Sawyer, who was still seated. With his left hand, Asbury grabbed Sawyer's right arm, which was in mid-gesture. With his right hand, Asbury seized Sawyer by the throat, and forced him back against the wall, pushing back and upward on Sawyer's neck.

8

Although the video indisputably shows that Asbury seized Sawyer by the neck, Asbury denied placing his hands on Sawyer's neck. JA 183. Instead, he claimed that he "placed [his] hand upon [Sawyer's] chest in the upper chest area." Id. On cross-examination, Asbury acknowledged that he had testified at his deposition that he placed his hand on Sawyer's "upper chest and throat area." JA 186.

Sgt. Kearns and Lt. Massey both testified that Asbury seized Sawyer by the neck. But, they claimed that Asbury was attempting to use "pressure point control tactics" on Sawyer's neck, and denied that Asbury was "choking" Sawyer. JA 232 (Kearns); see also JA 259 (Massey). Notably, Asbury did not testify that he attempted to use a pressure point control tactic on Sawyer at any time during the incident.

Sgt. Kearns believed the "pressure point" had "to do with a thumb up along the jawbone by the ear, something in that area." JA 232. He described the pressure point control tactic as "a pain compliance technique" and stated: "[W]hen someone has that on you it's causing pain and you try to get away from it." JA 232. But, Kearns denied that the purpose of such a technique is to cause pain or injury, explaining: "[I]t's in an effort to get them to do what you want them to do. You -- you apply the pressure to cause pain and you must tell them what to do; and when they comply, then you stop." JA 233. However, he could

not recall whether Asbury told Sawyer what to do while applying the pressure point tactic. Id.

The video indicates that, after Asbury lunged at Sawyer and seized him by the throat, Sgt. Kearns and Lt. Massey walked to either side of Asbury and Sawyer. Asbury drew his hand back as if to strike Sawyer, but what he did with his hand is not captured on the video, because the video skips at that point. A moment later, however, the video clearly shows that Asbury drew his fist back a second time and struck Sawyer in the face. Nevertheless, Asbury testified that he "did not punch Mr. Sawyer," JA 105, and "did not strike him." JA 106. The other two deputies also denied that Asbury hit Sawyer. See JA 245-46 (Kearns); JA 266 (Massey). Lt. Massey testified that he believed that what appears to be a punch on the video was another instance of Asbury attempting to touch a "pressure point" behind Sawyer's ear. JA 266.

According to the video, Asbury then grabbed Sawyer by the neck, and the other two deputies laid hands upon Sawyer's extremities. Sawyer's head and body rose higher.[7] After another moment, Sawyer's head and body rose above the deputies' heads.

_____

[7] Sawyer testified that, at this point, he was "trying to keep [his] tippytoes down to take the pressure off" of his neck. JA 128. It is not possible to discern from the video how much of Sawyer's upward movement was due to the deputies pushing Sawyer upward, as opposed to Sawyer's attempt to find a foothold on the floor to alleviate the pressure on his throat.

10

During this entire time, Asbury was holding Sawyer by the throat. Thereafter, the deputies pulled Sawyer to the ground. It is clear from the video, as well as from the testimony of Sawyer and Asbury, that Sawyer's face did not strike the ground when the deputies pulled him down. See JA 132 (Sawyer); JA 190 (Asbury). Sawyer was face-down and the upper half of his body was behind a corner and hidden from the view of the camera. Deputy Asbury also was not visible to the video camera, although the other deputies, who were grabbing and striking Sawyer in the arms and legs, were visible. The deputies proceeded to restrain Sawyer.

At trial, Sawyer claimed that Asbury punched him repeatedly in the head while he was on the ground; Asbury denied it. The video cannot resolve the dispute as to that portion of the incident.

The video and the trial testimony showed that, after restraining Sawyer on the ground for several seconds, and placing him in handcuffs, the deputies left Sawyer handcuffed and face down on the ground. As the deputies proceeded to other business, Sawyer remained unattended on the ground for several minutes. Eventually, Sawyer pulled himself to a seated position, reclining against the wall. See JA 136-38; JA 193-94; JA 249-251; JA 273-74.

11

Sawyer was bleeding from the nose, see JA 192; JA 273, and at some point he asked to be taken to the hospital. JA 138. Asbury transported Sawyer to the emergency room, where Sawyer was diagnosed with a broken nose, along with bruising to his face and extremities. Plaintiff's hospital records and the medical bill were entered into evidence, along with photographs of Sawyer that depicted his injuries. JA 145.

At the close of the evidence, Sawyer moved for judgment as a matter of law as to liability, and Asbury moved for a "directed verdict" on the basis of qualified immunity.[8] Pursuant to Fed. R. Civ. P. 50(b), the district judge reserved ruling on Sawyer's motion until after the jury returned its verdict. JA 277-78. In denying Asbury's motion, the district judge said: "I think it is a clearly established constitutional right that a pretrial detainee is not to be subjected to willful, wanton and outrageous punishment in the terms of a punch to the nose. Here the nose is broken." JA 278.

---

[8] Deputy Asbury also moved for a "directed verdict" on the same grounds at the close of plaintiff's case. JA 220-22. Fed. R. Civ. P. 50 was revised in 1991 to change the nomenclature of "directed verdict" to "judgment as a matter of law." However, the amendment did not "alter the substantive content of the standard." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 9B FEDERAL PRACTICE & PROCEDURE § 2521, at 223 (3d ed. 2008, 2013 Supp.) (indicating that a motion for directed verdict is synonymous with a motion for judgment).

The jury returned a verdict in favor of Deputy Asbury. Thereafter, Sawyer renewed his motion for judgment as to liability, which the district court granted. See Sawyer v. Asbury, 861 F. Supp. 2d 737 (S.D. W.Va. 2012).

In his opinion, the trial judge included a link to a portion of the video posted on the district court's website, see http://www.wvsd.uscourts.gov/videos/, which the judge incorporated by reference in his ruling. The district judge also included in his opinion several still images taken from the video. And, he provided a detailed description of the events depicted on the video, id. at 739-43 (internal citations, images, and footnote omitted), stating, in part:

> The officers brought Mr. Sawyer into the processing room.
>                          *   *   *
> Sergeant Kearns asked Mr. Sawyer to sit on a cement bench attached to the wall. Mr. Sawyer sat until Deputy Asbury had him stand while he removed the handcuffs and searched him. . . . After the pat-down, Mr. Sawyer sat back down.
>
> While Mr. Sawyer was seated on the bench, the video shows Mr. Sawyer and Deputy Asbury exchanging words and Deputy Asbury motioning upward, as if he was asking Mr. Sawyer to stand back up. Mr. Asbury also patted his chest while facing Mr. Sawyer. During the exchange, Mr. Sawyer remained seated on the bench and his lower back remained against the wall.
>
> Shortly after patting his chest, Deputy Asbury attacked Mr. Sawyer, violently grabbing him around the throat with his right hand.
>
> As Deputy Asbury was choking Mr. Sawyer with his right hand, the other officers in the room began to

13

move towards Deputy Asbury. Then Deputy Asbury pulled his arm back. The tape skips and does not show the completed arm movement.[ ]

Once the other officers reached Deputy Asbury's side and began holding Mr. Sawyer, Deputy Asbury pulled his right fist back again. The video clearly shows Deputy Asbury punching Mr. Sawyer in the face, with the force of his blow knocking Mr. Sawyer's face to the side.

The officers then took Mr. Sawyer to the floor . . . . Mr. Sawyer was left on the ground for a period of time until he managed to sit up.

In granting Sawyer's renewed motion for judgment as to liability and a new trial as to damages, the district court stated, in relevant part, id. at 738, 745-46 (internal citations and emphasis omitted):

> [T]he jury did what they thought was right but simply got it wrong . . . but that is what judges are for.
>                     *    *    *
> The video indisputably captures Deputy Asbury's excessive use of force on Mr. Sawyer at the Wood County holding center. I have incorporated a part of the videotape that was introduced at trial in this order so that all may see that the jury did not have a legally sufficient evidentiary basis to find for Deputy Asbury on the issue of liability.
>                     *    *    *
> While courts are not to simply rubber stamp a jury's verdict, judges believe that judgment as a matter of law is a power to be applied sparingly and only in the most extraordinary circumstances. No weighing of the evidence or credibility determinations are permitted. I made none.
>
> What the video shows cannot be reconciled with the jury's verdict. The video shows Deputy Asbury grabbing the plaintiff by the throat. The video shows Deputy Asbury punching the plaintiff in the face with his fist. The video shows the officers leaving an injured Mr. Sawyer lying on the holding center floor.

14

Mr. Sawyer walked into the holding center uninjured, and he left with a fractured nose and battered face. While Mr. Sawyer's verbal threats against Deputy Asbury were disgusting, they were still only words, and a pretrial detainee's words do not justify an officer's use of such force.

I find that no reasonable jury was at liberty to disregard the video evidence showing Deputy Asbury choking and punching Mr. Sawyer for no purpose other than inflicting unnecessary and wanton pain and suffering. I find that Deputy Asbury thereby violated Mr. Sawyer's right under the Due Process Clause to be free from excessive force while in pretrial detention.

On August 22, 2012, the district court entered a "Judgment Order" in accordance with the parties' request.[9] This timely appeal followed.

## II.

We review de novo the district court's grant of Sawyer's Rule 50 motion, viewing the evidence in the light most favorable

---

[9] Initially, Deputy Asbury filed a motion asking the district court to enter partial final judgment, pursuant to Fed. R. Civ. P. 54(b), so that he could take an immediate appeal from the district court's liability ruling. Although the district court denied that motion, Asbury noted an appeal, docketed in this Court as Sawyer v. Asbury, No. 12-1775. Thereafter, Asbury dismissed that appeal, and instead filed a Petition for Writ of Prohibition, asking this Court to direct the district court to reinstate the jury's verdict and cancel the new trial as to damages. See In re: Asbury, No. 12-1878. We denied the petition.

The parties jointly moved for entry of a final judgment in favor of Sawyer in the stipulated amount of one dollar, and advised the district court that they "had reached a side agreement concerning damages that is a high low agreement." JA 325. Accordingly, the district court awarded Sawyer nominal damages, noting that a "live controversy still exists between the parties regarding the defendant's liability." Id.

to Deputy Asbury as the non-moving party and drawing all reasonable inferences in his favor. Buckley v. Mukasey, 538 F.3d 306, 321 (4th Cir. 2008). The reviewing court "may not make credibility determinations or substitute [its] judgment for that of the jury." United States v. Kivanc, 714 F.3d 782, 795 (4th Cir. 2013). "We must affirm if a reasonable jury could only rule in favor of [Sawyer]; if reasonable minds could differ, we must reverse." A Helping Hand, LLC v. Balt. Cnty., Md., 515 F.3d 356, 365 (4th Cir. 2008).

Sawyer brought his excessive force claim pursuant to 42 U.S.C. § 1983. It establishes a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Thus, "analysis of an excessive force claim brought under § 1983 begins with 'identifying the specific constitutional right allegedly infringed by the challenged

16

application of force.'" Orem v. Rephann, 523 F.3d 442, 445 (4th Cir. 2008) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)).

In Graham, the touchstone case with respect to excessive force claims under § 1983, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." Id. at 393. The Court held that claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures; claims of excessive force against a convicted prisoner are governed by the Eighth Amendment's prohibition of "cruel and unusual punishment"; and claims of post-arrest excessive force against an arrestee or pre-trial detainee, as here, are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction "the use of excessive force that amounts to punishment." Id. at 395 & n.10. Accord Orem, 523 F.3d at 446; Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998).

Under the Fourteenth Amendment standard, a plaintiff must show that the defendant "'inflicted unnecessary and wanton pain and suffering' upon the detainee." Carr v. Deeds, 453 F.3d 593, 605 (4th Cir. 2006) (citations and some internal quotation marks omitted). "'The proper inquiry is whether the force applied was in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing

17

harm.'"  Id. (quoting Taylor, 155 F.3d at 483) (internal quotation marks omitted in Carr).

Moreover, no particular extent of physical injury is required to establish an excessive force claim under the Eighth Amendment or the Fourteenth Amendment.  In Wilkins v. Gaddy, 559 U.S. 34 (2010), involving an excessive force claim brought by a convicted prisoner under the Eighth Amendment, the Supreme Court abrogated a requirement to prove more than a de minimis injury, which the Fourth Circuit previously had applied in excessive force cases.  Id. at 39.  See, e.g., Taylor, 155 F.3d at 483; see also Orem, 523 F.3d at 447-48; Carr, 453 F.3d at 605-06; Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir.) (en banc), cert. denied, 522 U.S. 1030 (1997).[10]

---

[10] Prior to Wilkins, we had required plaintiffs in excessive force cases under either the Eighth or Fourteenth amendments to establish that the defendant inflicted upon the plaintiff "'more than de minimis'" injury, or alternatively, inflicted either force of "'a sort repugnant to the conscience of mankind'" or pain of a nature such that the "'pain itself . . . can properly be said to constitute more than de minimis injury.'"  Taylor, 155 F.3d at 483 (quoting Norman v. Taylor, 25 F.3d 1259, 1263 & n.4 (4th Cir. 1994)(en banc), cert. denied, 513 U.S. 1114 (1995)).  Although Wilkins was an Eighth Amendment case, the Supreme Court also disapproved the de minimis injury standard under the Fourteenth Amendment.  See Wilkins, 559 U.S. at 38-39 (overruling Riley (Fourteenth Amendment), Taylor (Fourteenth Amendment), and Norman (Eighth Amendment)).  In the wake of Wilkins, the trial judge correctly recognized that the de minimis injury standard is no longer applicable in either Eighth Amendment or Fourteenth Amendment cases.  See JA 222 ("The Supreme Court has overruled the Fourth Circuit on that issue. There is no doubt anymore about that.").

18

In applying these principles to the facts, we must determine whether, in the light most favorable to Asbury, the district judge correctly concluded that Asbury used excessive force. The lens of the video camera played a key role in the district court's decision, as it does here. The video clearly shows that, at least once, Asbury struck Sawyer in the face while two deputies began to hold him. Under binding Supreme Court precedent, the video recording of the incident operated as a legal constraint on the fact finding of the jury.

In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court held that, when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ." Id. at 380. Rather than relying on "visible fiction" propounded by the party whose account is contradicted by the video evidence, a court should "view[ ] the facts in the light depicted by the videotape." Id. at 381.

As we explained in Witt v. West Virginia State Police, Troop 2, 633 F.3d 272 (4th Cir. 2011), the principle articulated in Scott does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers some support for [the other side's] version of events." Witt, 633 F.3d at 276 (emphasis in

19

original).  Rather, the video controls only where it "'blatantly contradict[s]'" one side's testimonial account.  Id. (quoting Scott, 550 U.S. at 380).  Nevertheless, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court" when resolving a motion for judgment as a matter of law, "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."  Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) (applying Scott in context of motion for judgment as a matter of law).[11]

A review of applicable case law under § 1983 leaves no doubt that the district judge did not err in concluding that the video irrefutably established that Asbury engaged in the use of excessive force when he struck Sawyer in the face.[12]  We explain.

---

[11] Although Scott and Witt concerned motions for summary judgment, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves v. Sanderson Plumbing, 530 U.S. 133, 150 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

[12] In light of this conclusion, we do not resolve whether Asbury was justified in his alleged use of a "pressure point control tactic" (i.e., seizing Sawyer by the neck) to secure Sawyer's compliance with his directives.  The separate act of striking the detainee in the face was an unlawful method for the officer to obtain compliance with his orders.

20

In Orem v. Rephann, supra, 523 F.3d 442, while police officers were transporting a handcuffed arrestee to jail, the arrestee "yelled, cursed and banged her head against the police car window . . . . Her jumping and banging around in the back of the vehicle was so intense that the vehicle rocked." Id. An officer opened the door of the vehicle and repeatedly instructed the arrestee to "'calm down'" and to "'[s]top it,'" and admonished the arrestee "to respect" the officers. Id. The arrestee directed profanity at the officer, who stated, "'I'm telling you, you'd better stop it,'" and then "shocked [the arrestee] twice with a taser gun -- underneath her left breast and on her inner thigh." Id. at 445. At the time, the arrestee was in handcuffs and foot restraints. Id. at 443. The district court denied summary judgment to the officer on the arrestee's Fourteenth Amendment excessive force claim, and we affirmed.

This Court rejected the officer's claim that "his use of the taser gun was not excessive because [the arrestee] was unruly and uncooperative." Id. at 446. Although we acknowledged that "some action was necessary to calm [the arrestee] and safely transport her," we concluded that, in the light most favorable to the arrestee, the officer's "actions were not a 'good faith effort to restore order' but, rather, wanton and unnecessary." Id. This conclusion was based on several factors, including that the arrestee "was handcuffed,

21

weighed about 100 pounds, . . . and was locked in the back seat cage of [a police] car,"; that the officer tasered the arrestee immediately after she used profanity toward him; that the officer applied the taser to sensitive body areas; and, "after shocking" the arrestee, the officer "commanded that she respect the officers." Id. at 447.

United States v. Cobb, 905 F.2d 784 (4th Cir. 1990), is also instructive. There, four law enforcement officers were criminally prosecuted under 18 U.S.C. § 242 ("the criminal analog of 42 U.S.C. § 1983," id. at 788 n.6), for their use of excessive force against a detainee who was being held in a booking room after his arrest for public intoxication. Id. at 785. The detainee "and the officers exchanged insults and a heated argument ensued." The officers "proceeded to beat [the detainee] for almost two hours, insulting and ridiculing him the entire time." Id. The arrestee "remained handcuffed throughout the attack. At no point did he attempt to strike any of the officers." Id.

We upheld the convictions of three officers for use of excessive force, in violation of the detainee's Fourteenth Amendment rights. In doing so, we approved as "fairly stat[ing] the controlling law," id. at 789-90, the trial court's jury instructions, which stated, in pertinent part, id. at 787:

22

A law enforcement officer is justified in the use of any force which he reasonably believes to be necessary to effect arrest or hold someone in custody and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm.

Provocation by mere insulting or threatening words will not excuse a physical assault by a law enforcement officer. Mere words, without more, do not constitute provocation or aggression on the part of the person saying those words. No law enforcement officer is entitled to use force against someone based on that person's verbal statements alone.

Of import here, we said: "The trial court was entirely correct that words alone do not justify the excessive use of force against a pretrial detainee." Id. at 789. Accordingly, we rejected the officers' contention that "mere words by a pretrial detainee can justify the use of physical force by a police officer." Id.

Perhaps the most factually apposite of our prior cases is Jones v. Buchanan, 325 F.3d 520 (4th Cir. 2003). In that case, a handcuffed detainee in a processing room at a jail exchanged "'pretty foul language'" with a deputy, who then knocked the detainee to the floor, jumped on him, and crushed his nose. Id. at 524.[13] We reversed the district court's grant of qualified immunity to the deputy, stating, id. at 530 (citation omitted):

---

[13] Jones was litigated under the Fourth Amendment, rather than the Fourteenth Amendment. The detainee in that case had not been arrested. Rather, in an intoxicated state, he had asked officers to "'take [him] to jail so [he could] get sober"
(Continued)

23

To be sure, when Deputy Keller knocked Jones to the floor and injured him, Jones concedes that he was drunk, angry, and using foul language. However, mere use of foul language, even a drunk's loud use of such language in a police station, does not justify an objectively reasonable police officer knocking the drunk down, jumping on him, and breaking his nose. . . . [A] drunken plaintiff's 'screaming' and use of 'foul language' in a confined area . . . constitutes a mere 'nuisance' and not an immediate threat to the safety of the officers or others . . . .

We also noted that testimony that the officer had "hit Jones 'with his fist'" provided further "evidentiary support for Jones's contention that the level of force was excessive." Id. at 530 n.6. And, we stated: "Deputy Keller also cannot justify his actions based on Jones's slight physical movement -- simply beginning to stand up," id. at 530 (emphasis omitted), where the detainee "never pushed, kicked, or threatened anyone." Id.

Orem, Cobb, and Jones stand in marked contrast to Grayson v. Peed, 195 F.3d 692 (4th Cir. 1999), in which we rejected a claim of use of excessive force against a pretrial detainee. In Grayson, officers arrested a man for possession of marijuana and PCP after he was discovered with those substances while on the floor of a mall restroom stating, "I love everyone." Id. at

in advance of a court appearance scheduled for the following morning. 325 F.3d at 523. He was handcuffed "in keeping with 'standing' department policy for transporting persons to the sheriff's department." Id. Although we applied Fourth Amendment principles, Jones is closely on point with this case factually, and nothing in our analysis in Jones suggests that it would have been decided differently under the Fourteenth Amendment.

24

694. The man resisted arrest. Id. He was transported to a detention center where, after being strip searched, he attempted to escape his cell, causing a "struggle" to ensue with officers, who subdued the detainee with pepper spray. Id.

The next morning, the detainee "was again acting belligerently," sticking his arm through the food slot of his cell. Id. When one of the officers opened the door of the detainee's cell in an attempt to get the detainee to put his arm back, the detainee jammed his own foot in the doorway of the cell. A "five-man cell extraction team . . . pinned [the detainee] face down. During the course of the struggle [the detainee] was punched seven to nine times." Id. The detainee "continued to act violently" until the officers "placed him in four-point restraints." Id. A few minutes later, the detainee lost consciousness. Id. Although medics checked the detainee's pulse on two occasions and observed that "he was okay," the detainee suddenly ceased breathing. Id. Attempts at CPR were unsuccessful and the detainee died. Id.

In the § 1983 suit that followed, brought on behalf of the detainee's estate, we affirmed the district court's grant of summary judgment in favor of the officers. In light of the detainee's physical resistance and attempts to escape his cell, we ruled that the officers' "restraining measures were necessary to subdue" the detainee. Id. at 696. Therefore, we determined

25

that the "force applied by [the] officers was 'in a good faith effort to maintain or restore discipline,' and did not violate the Due Process Clause of the Fourteenth Amendment." Id. (citation omitted).

Unlike Grayson, in this case the video clearly reveals that Sawyer did not attempt any violent, unruly, or evasive act before Deputy Asbury hit him in the face. As in Orem, Carr, and Jones, the officer's assault here was provoked by the detainee's verbal tirade and/or his intransigence and failure to heed instructions.

To be sure, the detainees in Orem, Carr, and Jones were all in handcuffs when they were assaulted by officers, whereas in this case, Sawyer was not handcuffed when Asbury struck him. This distinction is not determinative, however. We did not state in Orem, Carr, or Jones that the officer's use of force was excessive because the detainee was in handcuffs. Nor did we suggest that, but for the handcuffs, the force would not have been excessive. Rather, as we reasoned in Jones, the handcuffs were significant because, "if [the detainee] was handcuffed behind his back," it was "hard to see how he would pose an immediate threat to anyone." 325 F.3d at 529. In this case, the video dispels any need to speculate as to whether Sawyer posed an immediate threat to the officers: it shows that Deputy Asbury, rather than Sawyer, was the aggressor.

26

We recognize that "the agents of the state are permitted to exercise a certain degree of force in order to protect the interests of society." Justice v. Dennis, 834 F.2d 380, 382 (4th Cir. 1987) (en banc), vac'd on other grounds, 490 U.S. 1087 (1989). In the Fourteenth Amendment context, an officer may use the force needed in a "'good faith effort to maintain or restore discipline,'" but the officer may not use force "'maliciously or sadistically for the very purpose of causing harm.'" Carr, 453 F.3d at 605 (citation omitted).

In the light most favorable to Asbury, he was faced with a detainee who was verbally defiant and uncooperative in response to Asbury's lawful order to stand, and Asbury resorted to "pressure point control tactics" to obtain compliance. Even if the jury credited the testimony of Kearns and Massey, to the effect that Asbury was using "pressure point control tactics" when he seized Sawyer by the neck, and even if the use of such "pressure point control tactics" was not excessive under the circumstances, that did not end the parties' contact. Asbury then proceeded to strike Sawyer in the face, just as the other deputies had begun to restrain Sawyer.

Sawyer's failure to comply with Asbury's order to stand did not justify Asbury in striking Sawyer in the face. A detainee's refusal to comply with an officer's lawful order, without more, is not a license to "take the gloves off."

27

Moreover, Asbury knew that Sawyer was unarmed, as he had just frisked Sawyer. Nor did the deputies' testimony that Sawyer engaged in "target glances" during the pat down support Asbury's decision to strike Sawyer. It is plain that, if the "target glances" had actually caused any of the deputies to be concerned that Sawyer was about to become violent, they would not have removed Sawyer's handcuffs or would have put him back in handcuffs at that time.

In sum, under the facts of this case, Asbury's deployment of a blow to the head of Sawyer, a detainee, in response to mere insulting words and noncompliance with the deputy's orders, was excessive. Such conduct did not constitute a good faith effort to maintain or restore discipline. The district court understood the import of the video evidence, which indisputably shows that Deputy Asbury used force that was excessive under the circumstances. Accordingly, the district court did not err in granting Sawyer's motion for judgment as a matter of law.

## III.

The district court also determined that Deputy Asbury was not entitled to qualified immunity, and Asbury challenges that ruling on appeal. We review de novo the court's denial of motion for judgment. Randall v. Prince George's Cnty., 302 F.3d 188, 201 (4th Cir. 2002).

28

"The doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" Merchant v. Bauer, 677 F.3d 656, 661 (4th Cir.) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)), cert. denied, ___ U.S. ___, 133 S. Ct. 789 (2012). "Qualified immunity extends to protect officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013) (quoting Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.) (en banc), cert. denied, ___ U.S. ___, 132 S. Ct. 781 (2011)); accord Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012).

The qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," Saucier, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case -- that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" Merchant, 677 F.3d at 662 (citation omitted). The "two inquiries . . . may be assessed in either sequence." Id. at 661-62; accord Pearson v. Callahan, 555 U.S. 223, 236 (2009).

29

As to the first inquiry, our analysis demonstrates that, taking the facts in the light most favorable to Deputy Asbury, his conduct indisputably violated Sawyer's Fourteenth Amendment rights.

The second inquiry, concerning whether the right at issue was clearly established, is "assessed in light of the legal rules that were 'clearly established' at the time" of the conduct at issue. Messerschmidt v. Millender, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citation and some internal quotation marks omitted). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting Ashcroft v. al-Kidd, 563 U.S. ___, 131 S. Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted).

In determining whether a right was clearly established, we "'ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose,'"[14] as of the date of the conduct in

_____

[14] The parties have not cited any pertinent case law from the Supreme Court of Appeals of West Virginia, and our own research has uncovered none.

issue. <u>Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.</u>, 597 F.3d 163, 176 (4th Cir.) (citation omitted), <u>cert. denied</u>, ___ U.S. ___, 131 S. Ct. 392 (2010). And, the "'nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity,'" because "'qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.'" <u>Wilson v. Kittoe</u>, 337 F.3d 392, 403 (4th Cir. 2003) (citations omitted). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

Arguably, the de minimis injury standard, discussed <u>supra</u>, remains relevant to Deputy Asbury's qualified immunity defense, because the incident at the detention center took place in October 2009, and the Supreme Court did not decide <u>Wilkins</u>, 559 U.S. 34, until February 2010. Therefore, at the time of the underlying events, the de minimis injury standard was part of the clearly established law of this circuit.

Nevertheless, that standard was readily satisfied here. Under clearly established law in October 2009, a broken nose was well within the range of injuries considered more than de minimis. <u>Compare</u> <u>Orem</u>, 523 F.3d at 447-48 (holding "electric shock, pain," and "sunburn-like scar" from taser application

31

more than de minimis); <u>Young v. Prince George's Cnty.</u>, 355 F.3d 751, 758 n.3 (4th Cir. 2004) (holding "'contusion, cut to [the] lips, bruises, lesions to [the] wrist, and a strained neck and back'" more than de minimis); <u>Robles v. Prince George's Cnty.</u>, 302 F.3d 262, 270 (4th Cir. 2002) (where police officers did not physically injure arrestee, but left him "tied up [to a metal pole in a shopping center parking lot] in a dark and deserted location in the middle of the night" such that he "did not know when or if anyone would come to rescue him or who might discover him" and "in the months following the incident he had trouble sleeping and was scared to leave his home," the "resulting injury was more than de minimis"); with <u>Taylor</u>, 155 F.3d at 484 (holding "temporary swelling and irritation" of the jaw and mucous membranes and "'abrasions about the wrists and ankles'" from handcuffs and leg irons was de minimis).

We recognize that "'police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving,'" and thus "the facts must be evaluated from the perspective of a reasonable officer at the scene, and the use of hindsight must be avoided." <u>Waterman v. Batton</u>, 393 F.3d 471, 476–77 (4th Cir. 2005) (quoting <u>Graham</u>, <u>supra</u>, 490 U.S. at 397) (internal citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," transgresses clearly

32

established constitutional rights. Graham, 490 U.S. at 396. Nevertheless, qualified immunity does not protect an officer "'who knowingly violate[s] the law,'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)), or an officer who makes an objectively unreasonable mistake. Henry, supra, 652 F.3d at 535. "If the law was clearly established, [a qualified] immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818–19 (1982).

With respect to qualified immunity, we are presented here with a situation similar to the one we encountered in Orem, where the incident was captured on a dashboard camera. See id. at 444 n.2. In evaluating whether the unlawfulness of an officer's use of a taser was clearly established from the perspective of a hypothetical "reasonable officer," the Orem Court said: "[W]e need not use hindsight or conjure up a pseudo-'reasonable officer' because, two other presumably 'reasonable officers' were at the scene." Orem, 523 F.3d at 448. We noted that the other officers on the scene never attempted to use a taser or physical force to subdue the arrestee.

In this case, the video shows that, when Asbury lunged at Sawyer and seized him by the neck, two other officers were standing several feet away, and neither reacted in such a way as

33

to suggest that Sawyer had suddenly exhibited threatening or volatile behavior. Indeed, the other deputies stood still for two seconds as Asbury seized Sawyer by the neck, and then they walked without urgency to Sawyer and grabbed him, just as Asbury struck Sawyer in the face. The conduct of the two deputies is a powerful indicator that a need to deploy violent force was not apparent to a reasonable officer.

Our substantive analysis of Deputy Asbury's conduct in striking Sawyer in the face is drawn entirely from pre-2009 case law and does not involve any novel extension of precedent. It was clearly established in October 2009 that "words alone do not justify the excessive use of force against a pretrial detainee." Cobb, supra, 905 F.2d at 789. Our precedent made it clear to any reasonable officer that "mere use of foul language . . . does not justify an objectively reasonable police officer knocking [an arrestee] down, jumping on him, and breaking his nose." Jones, supra, 325 F.3d at 530. Accordingly, the district court's rejection of Deputy Asbury's qualified immunity defense was legally correct.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

34