**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-7261**

ALTONY BROOKS,

       Plaintiff - Appellant,

   v.

LIEUTENANT JOHNSON; CAPTAIN JACUMIN; OFFICER FLUDD,

       Defendants - Appellees,

   and

HILL FINKLEA DETENTION CENTER; OFFICER JOHN DOE; NURSE JOHN DOE; OFFICER JOHN DOE; OFFICER GREENE; OFFICER JOHNSON; BERKELEY COUNTY SHERIFF'S OFFICE,

       Defendants.

**No. 17-7448**

ALTONY BROOKS,

       Plaintiff - Appellant,

   v.

LIEUTENANT JOHNSON; CAPTAIN JACUMIN; OFFICER FLUDD,

       Defendants - Appellees,

   and

HILL FINKLEA DETENTION CENTER; OFFICER JOHN DOE; NURSE JOHN DOE; OFFICER JOHN DOE; OFFICER GREENE; OFFICER JOHNSON; BERKELEY COUNTY SHERIFF'S OFFICE,

    Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Beaufort.  Patrick Michael Duffy, Senior District Judge.  (9:15-cv-2677-PMD-BM)

---

Argued:  December 11, 2018         Decided:  May 10, 2019

---

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

---

Vacated and remanded with instructions by published opinion.  Judge Harris wrote the opinion, in which Judge Keenan and Judge Wynn joined.

---

**ARGUED:** C. Daniel Lockaby, UNIVERSITY OF GEORGIA SCHOOL OF LAW, Athens, Georgia, for Appellant.  Kevin Michael DeAntonio, SENN LEGAL, LLC, Charleston, South Carolina, for Appellees.  **ON BRIEF:** Thomas V. Burch, Cary Berkeley Kaye, Wade Barron, Student Counsel, Sarah Quattrocchi, Student Counsel, Appellate Litigation Clinic, UNIVERSITY OF GEORGIA SCHOOL OF LAW, Athens, Georgia, for Appellant.  Christopher T. Dorsel, SENN LEGAL, LLC, Charleston, South Carolina, for Appellees.

PAMELA HARRIS, Circuit Judge:

A prison official deployed a taser three times against Altony Brooks when Brooks refused to hold still for an identification photograph. Brooks filed an Eighth Amendment excessive force suit, and the district court granted summary judgment against him, finding it beyond genuine dispute that the officer had applied force in a good faith effort to obtain Brooks's photograph.

We disagree. The critical Eighth Amendment question in this case is one of motive: whether the corrections officer shocked Brooks three times "in a good faith effort to maintain or restore discipline," or "maliciously" and "for the very purpose of causing harm," *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (internal quotation marks omitted). Viewing the record in the light most favorable to Brooks, as we must, we think a reasonable jury could find that the officer used multiple shocks not to induce Brooks's cooperation, but to punish him for his intransigence through the "wanton infliction of pain," *id.* at 320. Accordingly, we vacate the grant of summary judgment and remand for further proceedings consistent with this opinion.

**I.**

**A.**

Apart from the critical question of motive, the facts relevant to this appeal are largely undisputed. Indeed, much of the key incident is captured on soundless video footage, which we have reviewed carefully. Except where we attribute an allegation to a particular party, the following account is not contested.

3

The use of force in question occurred in 2013, when Altony Brooks was serving a prison sentence with the South Carolina Department of Corrections. On September 17 of that year, Brooks was transported to the Hill-Finklea Detention Center for a one-night stay, so that he could attend a nearby court appearance the next morning. From the time of his arrival, Detention Center officers reported, Brooks was "very disrespectful[] and uncooperative," "continuously threaten[ing] to sue the officers for anything he didn't like." J.A. 681–82 (contemporaneous incident report filed by corrections officer) ("Incident Report").

Detention Center policy requires that an identification photograph be taken whenever an inmate enters the facility. According to corrections officers, Brooks would not cooperate with their efforts to photograph him when he began his stay on September 17. The officers tried a second time the following afternoon, before Brooks's scheduled return to his permanent correctional facility. Brooks once again refused to cooperate, and the result was the episode at issue in this appeal.

This time, instead of forgoing the picture, Detention Center officers escorted Brooks to the booking area that housed the photography equipment. From this point on, Brooks was in handcuffs and held by two or more officers while additional officers closely flanked him; the total number of officers on the scene grew from five to six as events unfolded. According to the officers, this did not stop Brooks from using "aggressive" language and verbally threatening at least some of those present. *See* J.A. 689 (affidavit of defendant Captain Jacumin) ("Jacumin Affidavit"); *see also* Incident Report, J.A. 681 (describing Brooks as "making threats to the officers"). Brooks denies

4

threatening the officers, but his own account includes what could be described as "aggressive" verbal resistance. *See* J.A. 28 ("I advised that I was sovereign and I'm not taking any pictures. . . . I stated . . . that I was already false[ly] imprisoned and I'm not giving them no picture."). The soundless video cannot resolve inconsistencies on this point, and so we take the view more favorable to Brooks, as the party opposing summary judgment. *See Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011) (en banc).

The start of the video shows a substantial period of time – roughly seven and a half minutes – during which the officers appear to be "attempting to convince [Brooks] to let them take his picture," *Brooks v. Jacumin*, No. 9:15-cv-2677-PMD-BM, 2017 WL 3307648, at *3 (D.S.C. Aug. 3, 2017), consistent with the officers' own account, *see* Incident Report, J.A. 681 (referring to "several minutes of trying to reason with inmate Brooks"). But as the district court explains, it is clear from the video that Brooks continues to resist having his photograph taken, by "moving his head repeatedly to prevent a clear picture." *Brooks*, 2017 WL 3307648, at *1. This, too, is roughly consistent with the accounts of both Brooks and the officers involved. *See* Complaint, J.A. 28 ("I refused and turned my head repeatedly"); Jacumin Affidavit, J.A. 688 ("Brooks refused to allow [the officers] to take his picture by bending over out of the camera view and hiding his face.").

After this seven-and-a-half-minute period, the video shows one of the officers – Sergeant Sheila Johnston – pointing a taser gun at Brooks while two other officers hold Brooks in place. Though the record does not establish precisely what Johnston said, the parties agree, in substance, that Johnston warned Brooks that she would deploy the taser

5

if he did not cooperate. *See* Complaint, J.A. 28 ("if you move again I'll taze you"); Jacumin Affidavit, J.A. 689 ("Johnston warned [Brooks] that she would tase him if he did not stop."). Approximately ten seconds later, when Brooks continued to move around, Johnston deployed the taser for the first time, hitting Brooks in the leg. As the district court describes, Brooks "fell to the ground, writhed and kicked for approximately five seconds, and ultimately laid still." *Brooks*, 2017 WL 3307648, at *3.

While lying on the ground, Brooks was well outside the camera's frame, so his photograph could not be taken. Roughly 16 seconds after the first shock, while Brooks remained on the ground with two officers standing over him, Johnston deployed the taser for the second time. On the video, Brooks appears to thrash in pain. Two officers then brought Brooks to his feet, so that his head again was in camera range, and the officers tried once more to take his photograph.

Brooks, held by the officers, continued to move instead of holding still for the camera, though the parties dispute whether Brooks's movements were continued resistance, *see* Incident Report, J.A. 682 (Brooks "continued to . . . struggle with the officers"), or an involuntary response to the two taser shocks already administered, *see* Complaint, J.A. 29 (Brooks "tried to stay still"). Approximately 45 seconds after Brooks was pulled upright by the officers, Johnston deployed her taser for the third time. This time, the officers caught Brooks as he fell. The video concludes shortly thereafter, but the parties agree that the officers then were able to take Brooks's photograph.

6

Brooks alleges that he has experienced knee pain ever since the incident, and an MRI taken two years later revealed a kneecap irregularity and a possibly torn meniscus that he attributes to the use of force against him.

**B.**

Brooks, proceeding pro se – that is, without the assistance of counsel – filed a complaint under 42 U.S.C. § 1983 against Johnston and several other officers present during the incident. As relevant here, Brooks alleged that the corrections officers used excessive force in violation of the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII.

Two procedural issues arose in the early stages of Brooks's case. First, several months after Brooks filed his complaint, the district court dismissed Sergeant Johnston – the officer who deployed the taser – as a defendant in the case because Brooks had not properly served her during the 120-day period allowed under Federal Rule of Civil Procedure 4(m).[1] Brooks's complaint had misidentified Johnston, who is a sergeant, as a lieutenant, and misspelled her name as "Johnson," dropping the "t." As a result, the United States Marshals Service, which often effects service on behalf of prisoners like Brooks, *see* 28 U.S.C. § 1915(d), was unable to serve process on Johnston. Brooks made multiple efforts to advise the Marshals and the court of his initial error in identifying Johnston, sending the Marshals a letter with a corrected name and title and advising the

---

[1] Rule 4(m) subsequently was amended to shorten the presumptive service window to 90 days. The district court properly applied the 120-day period that governed when Brooks filed his complaint.

court that he had run out of service forms and needed its assistance. A magistrate judge nevertheless recommended dismissing Johnston from the case, and the district court adopted that recommendation, finding that Brooks had not shown "good cause" for his failure to serve Johnston. J.A. 449.

Johnston's dismissal left just two corrections officers as the defendants for Brooks's Eighth Amendment claim: Captain Kris Jacumin and Officer Selisa Fludd, who were present during the incident but did not themselves deploy the taser.[2] The case proceeded to discovery, at which point the second preliminary issue arose: a dispute over production of the Detention Center's use-of-force policies. When Brooks requested copies of those policies, the defendants objected, arguing that production would raise security concerns. The magistrate judge denied Brooks's motion to compel, noting only that the court "does not generally order production of restricted policies to inmates." J.A. 379.

After discovery closed, officers Jacumin and Fludd moved for summary judgment. Because they had not operated the taser, they could be held liable, if at all, only under a theory of bystander liability, which permits relief against an officer who "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act," *Randall v. Prince George's Cty.*, 302 F.3d 188, 203 (4th Cir. 2002); *accord Brooks*, 2017 WL 3307648, at *2. The officers' argument, however, did

---

[2] Other defendants were dismissed by the district court on procedural and jurisdictional grounds that Brooks does not contest on appeal.

8

not focus on their bystander status. Instead, they argued that Brooks's claim failed under the first prong of the bystander-liability test because Johnston – who *had* deployed the taser – had not acted unlawfully in doing so. According to the officers, multiple taser shocks were a proportionate response to Brooks's admitted and persistent refusal to "comply with the simple order to stand still and face the camera," and thus administered in a "good-faith effort to maintain or restore discipline" rather than maliciously to inflict pain. J.A. 656–57. In the alternative, the officers invoked qualified immunity: Even if Brooks's Eighth Amendment rights had been violated by the malicious use of force, they contended, the law was not so clearly established that they would have been on notice as to that violation.

The district court granted the officers' motion for summary judgment, finding that the record facts, viewed in the light most favorable to Brooks, failed as a matter of law to establish an Eighth Amendment violation. *Brooks*, 2017 WL 3307648, at *3–4. As the court recognized, the critical Eighth Amendment question was *why* Johnston had shocked Brooks three times using a taser: Was it in a good faith effort to secure his cooperation to take his picture, or maliciously and for the purpose of causing pain? *Id.* at *2 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). This was not a case, the court understood, in which the officers had used force in order to protect against an immediate threat to safety; handcuffed and surrounded by up to six officers, Brooks posed no physical safety risk. *Id.* at *3. But corrections officers also are entitled to use appropriate force to "maintain or restore discipline," *id.* at *2 (quoting *Whitley*, 475 U.S. at 320–21), and here, the court concluded, the record facts established beyond dispute that the reason

9

for the multiple taser shocks was simply "to acquire [Brooks's] compliance with [the Detention Center's] picture policy," *id.* at *4.

The court did not doubt that the taser shocks were painful to Brooks and constituted a serious use of force. But on Brooks's own account, the court explained, he "was refusing to obey the . . . officers' commands that he allow them to take his picture," and the video likewise shows him "refusing to comply" and instead "moving his head repeatedly to prevent a clear picture." *Id.* at *1–3. Moreover, the court emphasized, the officers can be seen on the video attempting for over seven minutes to "convince [Brooks] to allow his photograph to be taken," and resorted to violent force only after that "extended attempt to reason with him." *Id.* at *4. Given those undisputed facts, the court concluded, there was no "jury question as to excessive force" under *Whitley*'s subjective standard: As a matter of law, the officers used force not maliciously but to compel compliance with the Detention Center's photograph policy. *Id.* And because no constitutional violation had occurred, the bystander officers could not be held liable, and there was no need to reach the question of qualified immunity. *Id.* at *2.

## II.

Now represented by pro bono appellate counsel, Brooks advances several arguments on appeal. First and foremost, he argues that because there is a triable issue of fact as to whether the officers used force against him maliciously rather than in a good faith effort to secure his cooperation, the district court erred by granting summary judgment to the defendants. Second, Brooks contends that the district court should not

10

have dismissed Johnston from the case because he demonstrated "good cause" for his failure to serve her within the 120-day period. And third, Brooks argues that the magistrate judge improperly denied his motion to compel production of the Detention Center's use-of-force policies.

We agree with Brooks in all three respects. We begin with the main issue on appeal – Brooks's challenge to the grant of summary judgment – and conclude that whether Brooks was shocked by a taser three times in order to induce his compliance or as punishment for his continued resistance and belligerence is a jury question that was improperly decided by the district court as a matter of law. We then turn to Brooks's additional arguments for relief, and direct the district court, on remand, to allow Brooks additional time to serve Johnston and to compel the production of relevant Detention Center use-of-force policies.

## A.

We start with the district court's summary judgment ruling. "Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court." *Henry*, 652 F.3d at 531. In doing so, we "recogniz[e] that a court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). So here, we review the facts, including the video footage of the episode, in the light most favorable to Brooks, drawing all reasonable inferences in his

11

favor. If those facts are enough to generate a genuine dispute as to why Johnston used force against him, then summary judgment may not be granted under the first prong of the test for bystander liability. "A dispute is genuine if a reasonable jury could return a verdict for [Brooks as] the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

The officers advance two alternative arguments for why summary judgment was properly granted, paralleling their arguments before the district court. First, they contend, the district court correctly held that it was beyond genuine dispute that Johnston had used the taser in good faith, and so had not violated the Eighth Amendment. And because there was no underlying constitutional violation by Johnston, they conclude, they may not be held liable as bystanders. Second, the officers argue that even if the district court erred in this assessment, they nevertheless are protected by qualified immunity because any Eighth Amendment violation was not clearly established at the time of the incident. We disagree with both arguments.[3]

1.

---

[3] Both those arguments, we note, go only to the first prong of the test for bystander liability: whether Jacumin and Fludd were "confronted with a fellow officer's illegal act," *Randall*, 302 F.3d at 203. The district court rested entirely on that prong, holding that "fellow officer" Johnston did not commit an "illegal act" when she deployed the taser. The court thus had no occasion to consider the second two prongs: whether, assuming a constitutional violation by Johnston, bystanders Jacumin and Fludd "(2) possesse[d] the power to prevent it, and (3) cho[se] not to act," *id.* Nor do the parties substantially address those questions on appeal. We express no opinion as to whether Brooks can establish bystander liability under those prongs, leaving that matter to the district court on remand.

We begin with the question at the heart of this case: whether, as the district court held, the record indisputably shows that the use of three taser shocks against Brooks was a "good faith effort" to induce his cooperation in having his picture taken, and thus constitutionally permissible under the Eighth Amendment's subjective standard; or whether, as Brooks argues, there is a genuine dispute of fact on that point that must be resolved by a jury. As we explain below, we agree with Brooks.

a.

An inmate's Eighth Amendment excessive force claim involves both an objective and a subjective component. The objective component asks whether the force applied was sufficiently serious to establish a cause of action. This is not a high bar, requiring only something more than "*de minimis*" force. *Hudson v. McMillian*, 503 U.S. 1, 10 (1992); *see also Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (per curiam) ("nontrivial" force is sufficient ground for Eighth Amendment excessive force claim). For obvious reasons, the objective component is not at issue in this case. Nobody disputes that deploying a taser – a weapon "designed to cause excruciating pain" that can "burn a subject's flesh" – is a "serious use of force," *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 902 (4th Cir. 2016) (internal quotation marks and alterations omitted); *accord Brooks*, 2017 WL 3307648, at *3.

What is at issue is the subjective component of Brooks's excessive force claim, which asks whether the officers "acted with a sufficiently culpable state of mind," *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In contrast to the objective component, this is a demanding standard, *id.*; the "state of mind required . . . is

13

'wantonness in the infliction of pain,'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 322). And whether such wantonness can be established, as the district court recognized, "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted); *accord Brooks*, 2017 WL 3307648, at *2. As we have emphasized before, this subjective standard is unlike the "objective reasonableness" test we apply under the Fourth Amendment: The question is not whether a reasonable officer *could* have used force to maintain discipline, but whether these particular officers *did* use force for that reason. *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (internal quotation marks omitted); *id.* at 447 (discussing importance of motive to excessive force claims under *Whitley*); *see also Graham v. Connor*, 490 U.S. 386, 397–98 (1989) (contrasting standards and emphasizing focus on "subjective motivations of the individual officers" under the Eighth Amendment).

Corrections officers act in a "good faith effort to maintain or restore discipline" – that is, with a permissible motive – not only when they confront immediate risks to physical safety, but also when they attempt to "preserve internal order" by compelling compliance with prison rules and procedures. *See Hudson*, 503 U.S. at 6–7 (internal quotation marks omitted) (holding that *Whitley* standard, established in case involving use of force to quell a prison riot, applies to all claims of excessive force against prison officials); *see also Bailey v. Turner*, 736 F.2d 963, 970 (4th Cir. 1984) (rejecting rule that use of mace against recalcitrant inmate may be justified only by threat to physical safety).

14

And we owe officers "wide-ranging deference" in their determinations that force is required to induce compliance with policies important to institutional security. *See Hudson*, 503 U.S. at 6 (internal quotation marks omitted).

But corrections officers cross the line into an impermissible motive – using force "maliciously" and for the "very purpose of causing harm," *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted) – when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination, *see Williams*, 77 F.3d at 765 (summary judgment to prison officials improper where evidence "supports an inference that the guards were acting to punish, rather than to quell the disturbance"). In *Orem*, for instance, officers used a taser against an "unruly and uncooperative" detainee who yelled, cursed, threatened (profanely) to sue, and "bang[ed] around" in a car so intensely that the vehicle rocked. 523 F.3d at 444–46. We did not doubt that under the circumstances, "some action was necessary." *Id.* at 446. But the officers were not entitled to summary judgment under *Whitley*, we held, because a jury could infer that they did not in fact deploy the taser in a "good faith effort to restore order," but instead "for the very purpose of harming and embarrassing" the detainee after she continued to curse at the officers. *Id.* at 446–47 (internal quotation marks omitted). Likewise, in *Sawyer v. Asbury*, 537 F. App'x 283 (4th Cir. 2013), an unpublished decision arising from facts very similar to ours, a detainee unleashed on officers a "stream of invective" that included profanity and verbal threats, and refused to stand up so that he could be photographed. *Id.* at 285–86. The use of force that followed – what the officers described as the deployment of "pressure point control tactics," including striking the

15

detainee in the face – was constitutionally excessive, we held, because its purpose was not to induce the detainee to stand, but to punish him for his "verbal tirade" and "intransigence." *Id.* at 294.[4]

b.

There is no dispute in this case over the governing legal standard, laid out above. The defendants, consistent with this authority, maintain that they were on the right side of *Whitley*'s subjective inquiry, and that Johnston deployed her taser three times only in a good faith effort to compel Brooks's obedience with the order to stand still for a photograph. Brooks offers a different account, emphasizing the Incident Report's references to his "disrespectful" and "uncooperative" attitude from the time of his arrival at the Detention Center, J.A. 681, and maintaining that the defendants used the taser to "wantonly punish[]" him, *see Williams*, 77 F.3d at 764, for his belligerent resistance. Considering the facts in the light most favorable to Brooks and drawing all reasonable inferences in his favor, as we must, we think a reasonable jury could agree with Brooks.

---

[4] *Orem* and *Sawyer* both involved pre-trial detainees rather than prison inmates, with excessive force claims governed by the Fourteenth Amendment rather than the Eighth. But at the time we decided those cases, we employed the same *Whitley* standard – including its subjective component – in both contexts, and *Orem* and *Sawyer* analyzed precisely the same *Whitley* question we confront here: whether force was applied "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Orem*, 523 F.3d at 450 (internal quotation marks omitted); *Sawyer*, 537 F. App'x at 290 (internal quotation marks omitted). Since then, the Supreme Court has extended the Fourth Amendment's objective reasonableness standard to excessive force claims by pre-trial detainees. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

16

First and foremost is the fact that Brooks was shocked with a taser not once but three times, and in quick succession. We have held that even where an initial use of force does not by itself raise questions about a corrections officer's intent under *Whitley*, the continued application of force may give rise to an inference that force was used for malicious or punitive purposes. *See Iko*, 535 F.3d at 239–40, 240 n.11 (though initial use of pepper spray to carry out cell extraction appeared warranted, four additional bursts of pepper spray – including one when inmate was lying on floor – gave rise to reasonable inference that force was applied maliciously). The same is true here. We may assume for the moment that by itself, the first deployment of the taser – while Brooks was standing and refusing to hold still for a picture – does not suggest anything other than a "good faith effort" to restore discipline. But coupled with the next two deployments – one 16 seconds later, while Brooks was lying on the ground; the next less than a minute after that, after officers pulled Brooks back to his feet – the picture changes, and a reasonable jury could begin to question whether the entire series of taser shocks in fact was intended to punish Brooks, through the wanton infliction of pain, for his noncompliance and verbal aggression. *See Williams*, 77 F.3d at 765 (finding that the infliction of continued pain after initial use of force supports an inference of impermissible punitive motive under *Whitley*).

A jury might find that the second use of the taser, in particular, is hard to square with the officers' account. According to the officers, that second shock – which came 16 seconds after the first, and after Brooks had fallen, "writhed and kicked," and then "laid still," *Brooks*, 2017 WL 3307648, at *3 – was intended to induce Brooks to hold still for

17

a photograph. But at that point, Brooks was lying on the ground, making it impossible for him to put his head into camera range. And 16 seconds, at least some portion of which appears to have been spent in excruciating pain, does not give a recalcitrant inmate much time to reconsider and mend his ways. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 497–98 (6th Cir. 2012) (holding that jury could find taser shock unreasonable under Fourth Amendment where suspect "disoriented" from prior taser deployment was given only 30 seconds to comply with officer's order).

The defendants respond by contending that Brooks was struggling with the officers who were lifting him to his feet when he was shocked for the second time. But Brooks denies that, and the district court viewed it differently, *see Brooks*, 2017 WL 3307648, at *3 (describing Brooks as lying "still" on the floor when he was shocked the second time). At a minimum, it is fair to say that the video footage does not clearly support the officers' account, and so, at the summary judgment stage, we take the facts in the light more favorable to Brooks (and as described by the district court). Similarly, we cannot assume, as the officers assert, that Brooks continued to move around after he was brought to his feet and before the third taser shock because he had decided to maintain his resistance. Again, Brooks offers a contrary account, denying that he was resisting at that point and describing his shaking as an involuntary response to having sustained two taser shocks in under a minute. And again, a jury reasonably could question whether the 45 seconds that elapsed after Brooks was pulled to his feet and before he was shocked – for the third time in 70 seconds – gave Brooks the time and ability to collect himself and signal a decision as to whether he would comply.

18

In sum, whether or not the first use of the taser, standing alone, would give rise to any inference of malice, a reasonable jury viewing the three shocks together – three uses of an instrument designed to inflict excruciating pain in under 70 seconds – could infer "wantonness in the infliction of pain," intended not to restore order and induce compliance, but to punish Brooks for his belligerence. *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 322); *cf. Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 547 (7th Cir. 1988) (in employment discrimination context, evidence of improper motive for one action can support inference that other actions close in time also were improperly motivated).

To further support that inference, Brooks points to statements made by Detention Center officers complaining of Brooks's "disrespectful" attitude, continuous threats to sue, and alleged threats of future violence, all starting when Brooks arrived at the Detention Center. *See* Incident Report, J.A. 681–82 (Brooks was "very disrespectful" since arriving at the Center, "continuously threatened to sue the officers for anything he didn't like," and said "he was coming back to find us and we would be sorry"); J.A. 679 (Brooks "started making comments that we didn't know who we were messing with and that one call from him would make the world shake"). According to Brooks – who denies making violent threats, but whose own account otherwise is consistent with the officers' complaints – a reasonable jury could infer that the officers' use of force was motivated at least in part by their anger at those repeated provocations. And indeed, we held in *Orem* that that use of a taser against a detainee just after she "forcefully stated 'fuck you'" to an officer could support an inference under *Whitley* that force was used not

19

to restore order, but "for the very purpose of harming and embarrassing" the detainee in response. 523 F.3d at 447; *see also Sawyer*, 537 F. App'x at 286, 294 (finding that use of force against detainee after "'abrasive' and inappropriate language" – including profanity and threats of violence – was "provoked by the detainee's verbal tirade and/or his intransigence" rather than by good faith effort to compel cooperation with picture-taking). Here, too, we think a reasonable jury could take those statements into account in deciding whether Johnston administered multiple taser shocks to Brooks in a good faith effort to induce his cooperation, or maliciously and in retaliation for his insubordination and threats to sue. *See Thompson v. Virginia*, 878 F.3d 89, 99, 102 (4th Cir. 2017) (force applied against inmate "in retaliation for filing grievances" is used "maliciously and sadistically to cause harm" under *Whitley* (internal quotation marks omitted)).

Finally, there are the "*Whitley* factors," four factors laid out by the Supreme Court from which additional inferences may be drawn as to the officers' motives. *See* 475 U.S. at 321. Those factors are: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts made to temper the severity of a forceful response.'" *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321). The point of this analysis is to determine whether "[p]unitive intent behind a defendant's use of force may be inferred" because the force "is not reasonably related to a legitimate nonpunitive governmental objective," *Williams*, 77 F.3d at 765 (internal quotation marks omitted), or "could [not] plausibly have been thought necessary" by the officers, *Whitley*, 475 U.S. at 321. Even without direct

20

evidence of malicious intent, that is, we may "infer the existence of th[e] subjective state of mind" required for an Eighth Amendment violation from the *Whitley* factors. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 569 (6th Cir. 2013) (explaining that "[d]irect evidence . . . is not necessary" to prevail on the subjective element of an Eighth Amendment claim).

We think that the proper inferences to be drawn from these factors, too, is a matter for the jury. Perhaps most important, a reasonable jury could find that the third factor – the extent of any threat to safety – bolsters Brooks's account and not the officers'. As the district court recognized, at the time Johnston subjected Brooks to multiple taser shocks, Brooks was handcuffed and surrounded by officers, and presented "no immediate physical safety risk." *Brooks*, 2017 WL 3307648, at *3. This is not a case, in other words – unlike *Whitley* itself, in which corrections officers used force in response to hostage-taking during a prison riot, *see* 475 U.S. at 322–26 – in which a manifest and immediate need for the protective use of force gives rise to a powerful logical inference that officers in fact used force for just that reason.

Nor was the need for the use of force in this degree – the subject of the first two factors – so self-evident that no reasonable jury could infer a malicious motive. We do not question the legitimacy of the Detention Center's photograph policy, and we agree with the district court that the ability to "accurately identify inmates" is "essential to maintain security at correctional facilities." *See Brooks*, 2017 WL 3307648, at *3 (internal quotation marks omitted); *see also Hudson*, 503 U.S. at 6 (discussing deference courts should give prison administrators' judgments that their policies are "needed to

21

preserve internal order and discipline and to maintain institutional security" (internal quotation marks omitted)). At the same time, there are circumstances specific to this case suggesting something less than an urgent need for Brooks's photograph: Brooks was at the facility for only one night, and already on his way out by the time the incident occurred; and Detention Center officers already had access to Brooks's inmate photo ID card and other photographs of Brooks.

In any event, for reasons we already have discussed, a reasonable jury could question the need for "the amount of force," *see Whitley*, 475 U.S. at 321 (internal quotation marks omitted), that ostensibly was used solely to induce Brooks to hold still for a picture. The record gives no indication that the officers considered any lesser or graduated sanctions against Brooks, jumping instead straight to three rapid-fire deployments of a taser that left Brooks writhing in pain. *Cf. Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("Even when a prisoner's conduct warrants some form of response, evolving norms of decency require prison officials to use techniques and procedures that are both humane and restrained."). In *Sawyer*, we held that a belligerent detainee's "refusal to comply with an officer's lawful order" to stand so that his photograph could be taken could not justify, as a matter of law, the force used against him, in the form of "pressure point control tactics" that included striking him in the face. 537 F. App'x at 294. Here, we hold only that it is for a jury to decide whether the degree of force used against Brooks was disproportionate to the need for his picture in a way that could raise an inference of impermissible "[p]unitive intent," *Williams*, 77 F.3d at 765 (internal quotation marks omitted).

22

Finally, there is *Whitley*'s fourth factor, which focuses on corrections officers' efforts to avoid or temper a forceful response. The district court relied heavily on this factor in granting summary judgment to the defendants, emphasizing that the first seven and a half minutes of the video shows the officers "expend[ing] significant time and effort . . . attempting to reason with [Brooks] to secure a single photograph," and that they resorted to violent force only after that "extended attempt" proved unsuccessful. *Brooks*, 2017 WL 3307648, at \*3–4. We do not doubt that the officers would have been enormously and justifiably frustrated by Brooks's persistent intransigence in the face of their efforts. But we have confronted precisely this argument before, and held that "verbal attempts" to reason with and calm an unruly detainee before resort to force do *not* preclude an inference that force was applied maliciously, in order to punish this continued intransigence. *See Orem*, 523 F.3d at 447 (officer's "verbal attempts to secure order" do not "lessen the unreasonableness of his subsequent actions"). To be clear, under *Whitley*, a jury should consider the officers' preliminary efforts to secure Brooks's compliance without using violent force, which may well bolster their case. But the ultimate inferences to be drawn from this *Whitley* factor, like the others, are not so plain that they may be resolved as a matter of law at this stage of the litigation.

It of course is true, as the district court reasoned, that "[i]nmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Brooks*, 2017 WL 3307648, at \*3 (internal quotation marks omitted). Detention Center officers were permitted to insist on Brooks's compliance with their photograph policy, and when he resisted, they were permitted to take measures, including the use of appropriate force,

23

intended to secure his cooperation. Indeed, because this case arises under *Whitley*'s subjective standard, we have no occasion to consider whether a hypothetical and objectively reasonable officer *could* have used a taser against Brooks – once, twice, or three times – in order to compel his compliance with the Detention Center's photograph policy. *See Orem*, 523 F.3d at 445–46 (distinguishing Fourth Amendment objective reasonableness standard from *Whitley*'s subjective inquiry).[5] The only question here is whether *these* officers actually *did* use force to induce compliance, or whether, as Brooks alleges, they used force "wantonly" and "maliciously" for the purpose of punishing him. Because the record contains evidence from which a reasonable jury could infer a malicious and therefore excessive use of force, the district court erred in deciding this question as a matter of law.

2.

Because we conclude that a reasonable jury could find that Sergeant Johnston violated the Eighth Amendment by using force "maliciously," we – unlike the district court, *see Brooks*, 2017 WL 3307648, at *2 – must consider the officers' alternative argument: that they nevertheless are entitled to summary judgment on qualified immunity grounds because the law did not clearly establish that violation. Once again, we disagree.

_____

[5] We note, however, that under the Fourth Amendment, our court has held that because a taser deployment is such a serious use of force, a police officer ordinarily may use a taser against a suspect only in "a situation in which a reasonable officer would perceive some immediate danger," and not to compel compliance with police commands. *Armstrong*, 810 F.3d at 903.

Under the doctrine of qualified immunity, a corrections officer who "has violated a prisoner's constitutional right" is "shielded from liability . . . if an objectively reasonable officer could have believed that his actions were lawful in light of clearly established law." *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016) (internal quotation marks omitted). The officers contend that qualified immunity attaches because there are no cases from the Supreme Court or our circuit finding an Eighth Amendment violation under circumstances sufficiently analogous to those presented here and, as a result, Brooks's right to be free from Sergeant Johnston's multiple uses of a taser was not "clearly established." *See Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (in applying the "clearly established" qualified immunity standard, we look "ordinarily to the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose" (internal quotation marks omitted)).

We note at the outset that this is the unusual qualified immunity case in which we are dealing with a constitutional violation that has "wrongful intent" as an element. *See Thompson*, 878 F.3d at 106 (applying qualified immunity analysis to excessive force claim under *Whitley* standard). If Johnston violated Brooks's rights, that is, then she did so because she used force in subjective bad faith, "maliciously and sadistically to cause harm." *See id.* at 99 (internal quotation marks omitted). That state of mind is relevant to the qualified immunity analysis, as we have explained: Because "the case law is intent-specific," clearly establishing that the bad faith and malicious use of force violates the Eighth Amendment rights of prison inmates, a corrections officer who acts with that culpable state of mind reasonably should know that she is violating the law. *See id.* at

25

106 ("For claims where intent is an element, an official's state of mind is a reference point by which she can reasonably assess conformity to the law because the case law is intent-specific.").[6]

In *Thompson*, we rejected an argument very similar to that advanced by the officers here. In that case, a corrections officer invoked qualified immunity after subjecting an inmate to a "rough ride" in a van, allegedly in retaliation for grievances filed by the inmate, arguing that our precedent did not provide "fair warning" that a rough ride constituted excessive force. *Id.* at 102. We acknowledged that only a "few" courts had "addressed specifically an officer's use of a vehicle to injure an inmate." *Id.* at 103. But, we held, it *was* clearly established that inmates have a "right to be free from" the "malicious" infliction of pain. *Id.* at 102; *see also id.* at 97–98 (discussing *Whitley*'s subjective component). If the officer acted with that wrongful intent – using force to punish the inmate for his grievance filings – then he could use that "state of mind" as a "reference point" to measure his conformity with the law. *Id*. at 106. And the fact that this officer used force in the form of a vehicle rather than "direct punches and kicks . . . makes no difference to the constitutional analysis": the "intentionally erratic driving was

---

[6] Like other circuits, we long have recognized the "special problem" raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of "deliberate indifference" to a prisoner's medical needs. *See Rish v. Johnson*, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997); *see also Cox*, 828 F.3d at 238 n.4 (collecting cases). *Thompson* makes clear that the same issue arises with respect to Eighth Amendment excessive force claims, which likewise require wrongful intent. 878 F.3d at 106 (discussing deliberate indifference and excessive force claims together).

simply a different means of effectuating the same constitutional violation." *Id.* at 102. Accordingly, we held, the law provides "fair notice to prison officials that they cannot, no matter their creativity, maliciously harm a prisoner on a whim or for reasons unrelated to the government's interest in maintaining order." *Id.* at 105.

For the same reasons, the defendants in this case cannot establish a lack of "fair notice" that the use of a taser against Brooks – assuming, as we do for purposes of this alternative argument, that a jury finds that Johnston acted with wrongful and malicious motive – constituted excessive force under the *Whitley* standard. At the time of the events in question, it was clearly established that a corrections officer's use of force in bad faith – not to preserve order or induce compliance, but to punish through the "wanton infliction of pain" – violates an inmate's Eighth Amendment right. *See, e.g.*, *Williams*, 77 F.3d at 765 (quoting *Whitley*, 475 U.S. at 322). If Johnston acted with such a motive, then she could "reasonably assess [her] conformity" to that "intent-specific" law. *Thompson*, 878 F.3d at 106.

Johnston also would have had the benefit of cases from this circuit making clear, at a high "level of specificity," *id.* at 102, that her multiple uses of a taser against Brooks, under the circumstances of this case, could give rise to an inference of "wanton[] punish[ment]," *see Williams*, 77 F.3d at 764, in violation of *Whitley*'s subjective component. In *Iko*, for instance, approximately five years before this case arose, we held that even where a first use of pepper spray by a corrections officer appeared to be intended only to induce compliance with a cell-extraction procedure, the fact that it was followed almost immediately by multiple additional bursts of pepper spray – including

27

one when the inmate was lying on the ground – gave rise to a reasonable inference that force was applied "for the sole purpose of infliction of pain" in violation of *Whitley*'s subjective standard. 535 F.3d at 239–40 (internal quotation marks omitted). Here, of course, the officer used force in the form of a taser, not pepper spray – but as we clarified in *Iko* (and in *Thompson*, as discussed above), that is not enough to deprive an officer of fair notice that the same principle will apply. *Id.* at 240 (rejecting argument that right to be free of malicious use of *pepper spray* was not clearly established because prior case law only addressed malicious use of *mace*).

And even if it were, there still would be *Orem*, also decided in 2008, in which we held that a taser, in particular, could be found by a jury to have been used "maliciously and sadistically" under circumstances very similar to those presented here: an unruly (but handcuffed) arrestee who refused to cooperate in efforts to transport her, flinging her body around so intensely that the vehicle rocked, 523 F.3d at 444; a profanity-laced diatribe that included threats of suit, *id.* at 445 ("I'm suing everybody, you mother fucker."); an initial effort to induce cooperation verbally, *id.* at 446; and, ultimately, two deployments of a taser, *id.* at 445. Though it was "clear that some action was necessary to calm . . . and safely transport" the detainee, we held, a jury nevertheless could find that the officer in fact had used force not for that purpose, but instead maliciously and "for the

very purpose of harming and embarrassing" the detainee, in violation of *Whitley*. *Id.* at 446–47.[7]

In short, we find that Johnston was on "fair notice" of Brooks's right not to be subjected to excessive force in the form of the wanton infliction of pain, intended to punish rather than to induce compliance. Accordingly, the defendants are not entitled to summary judgment on qualified immunity grounds on this basis, as they argue in the alternative on appeal. We therefore vacate the district court's grant of summary judgment for the defendants.

**B.**

We turn now to Brooks's other arguments on appeal, starting with his contention that he demonstrated good cause for his failure to timely effect service on Johnston. We agree, and therefore vacate the dismissal of Johnston from the case.

Federal Rule of Civil Procedure 4(m) allows the court to dismiss any defendant who is not served within the applicable timeframe. Generally, "[a]s with other procedural dismissals, we review a dismissal under Rule 4(m) for abuse of discretion." *Attkisson v. Holder*, 919 F.3d 789, 809 (4th Cir. 2019). But importantly, the rule makes clear that "if the plaintiff shows good cause for the failure, the court *must* extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m) (emphasis added).

---

[7] Because *Sawyer*, which we discuss in connection with the merits of Brooks's claim, is not a published decision, we do not rely on it for our qualified immunity analysis. *See Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc).

Accordingly, a court abuses its discretion if the plaintiff makes a clear showing of good cause and the court nonetheless declines to grant an extension.

That is what happened here. As many of our sister circuits have held, when a plaintiff in an *in forma pauperis* action, like Brooks, provides the Marshals with the correct information to serve the defendant, a subsequent failure to effect service upon that defendant constitutes "good cause" for an extension. *See Rance v. Rocksolid Granit USA, Inc.*, 583 F.3d 1284, 1287 (11th Cir. 2009) (collecting cases). The defendants here do not dispute that Brooks ultimately provided the Marshals with the information required to serve Johnston. Instead, they argue that Brooks's efforts were inadequate because the information was belated and not on the proper form. Under the circumstances of this case, we conclude that those facts do not negate the establishment of "good cause" for an extension under Rule 4(m).

First, Brooks made multiple attempts during the 120-day service window to advise the Marshals and the district court of Johnston's service information, including her correct name and title. He also informed the district court that he had run out of the proper forms, and asked for the court's assistance. We think those efforts to comply with the service rules are consistent with a finding of "good cause." *See Himmelreich v. United States*, 285 F. App'x 5, 7 (3d Cir. 2008) (finding that plaintiff demonstrated "good cause" under Rule 4(m), despite failing to submit the proper form to the Marshals, when he did not receive Service of Process forms and made substantial attempts to comply with the service rules).

Second, we note that Johnston does not point to any prejudice from a delay in effecting service on her.  Nor does it seem that she could.  Johnston was represented by the same attorneys as her co-defendants, who filed a notice of appearance on her behalf; she presumably was fully aware of the case as it proceeded.  Indeed, through counsel, Johnston was able to advise the district court, during the service window, that Brooks's complaint misspelled her name and misidentified her title.

Accordingly, we find that Brooks has established good cause for his failure to effect timely service and that the district court abused its discretion by dismissing Johnston under Rule 4(m).  We therefore vacate Johnston's dismissal from the case and instruct the district court, on remand, to allow Brooks additional time in which to serve Johnston.[8]

## C.

Finally, and for the purpose of clarifying what evidence will enter the record as this case proceeds, we address Brooks's third argument:  that the magistrate judge erred by failing to compel production in discovery of the Detention Center's use-of-force policies.  We agree that Brooks was entitled to those documents, and therefore instruct the that their production be compelled on remand.

---

[8] Brooks also argues, in the alternative, that the magistrate judge committed reversible error by denying a motion he filed to amend his complaint by correcting Johnston's name in the caption.  Because we vacate Johnston's dismissal on other grounds, we do not reach this argument.

31

We recognize, of course, that this court "affords a district court substantial discretion in managing discovery and reviews the denial or granting of a motion to compel discovery for abuse of discretion." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). But that discretion is not boundless, and a district court or magistrate judge may abuse its discretion when it denies a motion to compel production of non-privileged materials whose relevance greatly exceeds the burden or expense of production. *See* Fed. R. Civ. P. 26(b).

That high standard is met here. As detailed above, Brooks's Eighth Amendment claim turns on a question of subjective intent: Johnston violated the Eighth Amendment if she intended to cause harm maliciously, but not if she acted in good faith. *See Whitley*, 475 U.S. at 320–21. As our cases make clear, whether an officer has complied with or, alternatively, violated a relevant use-of-force policy, while not dispositive, is highly relevant to that inquiry. Adherence to a policy, we have explained, "provide[s] powerful evidence that the application of force was tempered and that the officers acted in good faith." *Williams*, 77 F.3d at 766. So if Detention Center policy calls for the use of a taser to induce inmates to cooperate in efforts to take their pictures, or in similar circumstances more broadly defined, then that would support the officers' contention that Johnston acted in a good faith effort to enforce discipline. *See id.* If, on the other hand, Johnston was acting in contravention of an applicable use-of-force policy when Brooks was subjected to three taser shocks, then that would tend to suggest the opposite: that she applied force in bad faith and with punitive intent. *See Iko*, 535 F.3d at 240 (relying in part on violation of "Use of Force Directive" to support inference that pepper spray was

32

administered for improper and malicious purpose); *Orem*, 523 F.3d at 447 (relying in part on violation of taser policy to support inference that taser was deployed maliciously).

Nor are we persuaded by the magistrate judge's apparent rationale that requests for use-of-force policies typically are denied for security reasons. As demonstrated by *Williams*, *Iko*, and *Orem* – along with numerous other cases cited by Brooks – relevant use-of-force policies routinely are considered in excessive-force litigation, including litigation that arises in the prison context. Accordingly, the magistrate judge erred by denying Brooks's motion to compel production of relevant policies concerning the use of force against inmates in similar circumstances. Of course, reasonable mechanisms – such as redaction of text that is not relevant to the case – may be permitted in order to limit any purported security concerns.[9]

## III.

For the foregoing reasons, we vacate the grant of summary judgment to the defendants on Brooks's Eighth Amendment claim and the dismissal of Johnston from the case, and remand for further proceedings consistent with this opinion.

---

[9] Brooks also argues on appeal that the magistrate judge committed reversible error by denying his several motions for the appointment of counsel. Because we grant the relief that Brooks is seeking on his other three claims, the denial of Brooks's motions for counsel did not cause any prejudice, and therefore this argument is moot. On remand, however, we suggest that the court consider appointing counsel for Brooks to assist in litigating the case, consistent with applicable local rules and procedures. *See Williams v. Collier*, 357 F. App'x 532, 536 (4th Cir. 2009) (per curiam) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 205 (2d Cir. 2004)).

*VACATED AND REMANDED WITH INSTRUCTIONS*