**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-6853**
_____

EDWIN BLADIMIR ESCOBAR-SALMERON,

Plaintiff – Appellant,

v.

STEPHEN T. MOYER; COREY T. HOLLAND; CO II DANIEL ARNDT,

Defendants – Appellees.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:19-cv-02717-RDB)

_____

Argued:  September 24, 2024                    Decided:  August 14, 2025

_____

Before AGEE, RUSHING, and BENJAMIN, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Benjamin wrote the opinion, in which Judge Agee and Judge Rushing joined.

_____

**ARGUED:**  Dallas Floyd Kratzer, III, Columbus, Ohio, Margaret Ann Lohmann, STEPTOE LLP, Bridgeport, West Virginia, for Appellant.  Sandra Diane Lee, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:**  Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

_____

DEANDREA GIST BENJAMIN, Circuit Judge:

Correctional Officers Corey T. Holland and Daniel Arndt (collectively, "the Correctional Officers") received a tip that a prisoner at Eastern Correctional Institution ("ECI"), Edwin Bladimir Escobar-Salmeron, had a knife. The Correctional Officers ordered Escobar-Salmeron and his cellmate to exit their cell and escorted the two men to the institution's recreation hall, known as the Day Room. Once in the Day Room, the Correctional Officers strip searched—and by Escobar-Salmeron's account, brutally beat—Escobar-Salmeron.

Escobar-Salmeron sued the Correctional Officers and Stephen T. Moyer, the former secretary of the Maryland Department of Public Safety and Correctional Services, alleging that the Correctional Officers violently assaulted him in violation of the Eighth Amendment and Maryland law. The Correctional Officers disputed Escobar-Salmeron's compliance with the strip search, his injuries, and the sequence of events through which the confrontation turned physical. But the district court nonetheless dismissed Escobar-Salmeron's Maryland law claims and his claims against Moyer before granting summary judgment on Escobar-Salmeron's remaining excessive force claim because "[t]he undisputed evidence d[id] not support [the] allegation that Officers Holland and Arndt used force maliciously or sadistically." *Escobar v. Moyer*, No. RDB-19-2717, 2020 WL 2061503, at *5 (D. Md. Apr. 29, 2020). Escobar-Salmeron appealed, challenging the district court's grant of summary judgment on his excessive force claims against the Correctional Officers.

2

Finding that material facts remain in dispute, we vacate the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

## I. Facts and Proceedings Below

Because this case is before us on appeal from a grant of summary judgment, we view the facts "in the light most favorable to the non-moving party." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 407 (4th Cir. 2015) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). We also draw all reasonable inferences in their favor. *Bennett v. Garner*, 913 F.3d 436, 438 (4th Cir. 2019).

### A. The Search

Acting on a tip that Escobar-Salmeron possessed a knife, the Correctional Officers planned to search Escobar-Salmeron and his cell. They arrived at the cell shortly before 9:00 a.m. and ordered Escobar-Salmeron and his cellmate, Gabriel Struss, to remain in their bunks. While lying in the top bunk, Escobar-Salmeron "pull[ed] the sheet over his body and beg[an] to move his hands underneath of his body." J.A. 190 (Arndt's Use of Force report).[1] Arndt ordered Escobar-Salmeron "to stop moving, come down from his bunk, and be handcuffed." J.A. 190. Escobar-Salmeron complied. The Correctional Officers then escorted both men to the Day Room. At this point, the parties' stories diverge.

### i. The Correctional Officers' Version

---

[1] Citations to "J.A." refer to the joint appendix filed by the parties, which contains the record on appeal.

Across their various incident reports and affidavits, the Correctional Officers recall that Holland ordered Escobar-Salmeron "to place his hands on the wall and to remove one piece of clothing at a time." J.A. 189. Escobar-Salmeron took off his shirt, then "placed his hands near his crotch area." J.A. 189. Holland ordered Escobar-Salmeron to place his hands on the wall. Though Escobar-Salmeron did not comply with this first order, when Holland repeated himself, Escobar-Salmeron placed his hands on the wall. J.A. 189.

Next, Holland ordered Escobar-Salmeron to remove his shorts and hand them to Arndt. J.A. 189. Escobar-Salmeron complied. J.A. 189. At that time, Arndt discovered a homemade sheath wrapped in Escobar-Salmeron's shorts. J.A. 189. Arndt asked Escobar-Salmeron whether "he had a weapon on him." J.A. 189. Escobar-Salmeron denied having a weapon, saying "there's no knife" and that the sheath was his "pencil holder." J.A. 189.

Escobar-Salmeron again placed his hands "near his crotch area," and Holland again ordered to him to put his hands on the wall. J.A. 189. When Escobar-Salmeron did not comply, Holland repeated his order several times. J.A. 189. Escobar-Salmeron then "turned towards [Holland] in an aggressive manner and was placed on the wall." J.A. 189. Holland twice more ordered Escobar-Salmeron to place his hands on the wall, and Escobar-Salmeron again did not comply. J.A. 189. Escobar-Salmeron "then tried to maneuver himself at which time [Holland] placed [Escobar-Salmeron] on the floor trying to gain compliance." J.A. 189.

Once on the floor, Escobar-Salmeron "continued to struggle" with Holland. J.A. 189. Holland "then ordered [Escobar-Salmeron] to stop resisting," but Escobar-Salmeron

4

did not comply. J.A. 189. Instead, he "bit [Holland's] lower right arm." J.A. 189. Holland told Arndt that Escobar-Salmeron was biting him, so Arndt came to Holland's aid. J.A. 189.

The Correctional Officers' stories vary about how exactly Arndt assisted Holland. In the majority of their accounts, the Correctional Officers maintain that Arndt "place[d] his hand on [Escobar-Salmeron's] forehead and pulled his face away from [Holland's] arm." J.A. 189 (Holland's Use of Force Incident Report dated June 15, 2017); *see also* J.A. 59 (Holland's Notice of Inmate Rule Violation dated June 16, 2017), 191 (Holland's Use of Force Incident Report dated June 16, 2017), 194 (Arndt's Notice of Incident dated June 17, 2017), 222 (Holland's Affidavit dated June 12, 2018), 225 (Arndt's Affidavit dated June 4, 2018). But at other times, the Correctional Officers have both claimed that Arndt "utilized a pressure point behind [Escobar-Salmeron's] ear." J.A. 34 (Motion to Dismiss, or, in the alternative, for Summary Judgment), 45 (same), 172 (Investigative Report dated September 6, 2017), 283 (Assault Proceedings).

After Arndt intervened, Escobar-Salmeron released Holland's arm. J.A. 189. Holland ordered Escobar-Salmeron "to place his hands behind his back to be handcuffed." J.A. 189. Escobar-Salmeron did not comply. J.A. 189. At this point, a third officer arrived and "assisted in getting [Escobar-Salmeron's] hands behind his back." J.A. 189. Arndt then handcuffed Escobar-Salmeron, and Holland and Arndt "removed [them]selves from the situation." J.A. 189. Four officers not party to this suit "took control of [Escobar-Salmeron] and escorted him to medical." J.A. 189.

5

In a subsequent search of Escobar-Salmeron's cell, Arndt found "a 6 ¾ inch long knife style homemade weapon" in a slit in Escobar-Salmeron's mattress. J.A. 191. The homemade weapon was "the exact shape and length to fit inside of the sheath that was discovered" in Escobar-Salmeron's shorts. J.A. 191.

### ii. Escobar-Salmeron's Version

In his original verified complaint[2] and other filings, Escobar-Salmeron maintains that the altercation proceeded as follows.

Holland gave Escobar-Salmeron "[v]arious orders" over the course of the strip search, with which he "promptly complied." J.A. 11. Even so, Holland, "without cause or justification otherwise grabbed [Escobar-Salmeron]" and "forc[ed] him to the floor." J.A. 11. Holland then began to repeatedly punch, kick, and choke him while laughing and screaming "stop resisting." J.A. 11. At some point, though it is unclear when, Arndt also began to punch and kick Escobar-Salmeron to "assist" Holland. J.A. 11. Throughout the altercation, Escobar-Salmeron repeatedly told Holland that he could not breathe. J.A. 11. But Holland did not loosen his hold. J.A. 11. Consequently, Escobar-Salmeron bit Holland's lower right arm "[]in an effort to obtain air." J.A. 11. Finally, Holland "relinquished his choke hold." J.A. 11.

---

[2] We treat Escobar-Salmeron's original verified complaint as "an opposing affidavit for summary judgment purposes" because "the allegations contained therein are based on personal knowledge." *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)). That Escobar-Salmeron subsequently amended his complaint "does not divest an earlier verified complaint of its evidentiary value." S*ee id.* at 499.

After the Correctional Officers handcuffed him, Escobar-Salmeron alleges that "Holland kicked him in the back of the head and face," and when the other officers arrived, they "beat [Escobar-Salmeron] and messed up [his] shoulder and spine." J.A. 34, 268.

## B. Medical Treatment

When Escobar-Salmeron arrived at medical after the incident, the nurse "noted [Escobar-Salmeron's] bleeding lower lip, [but was] unable to assess [his] teeth, tongue, [or] gums." J.A. 85. She observed that Escobar-Salmeron had "blood under [his] right earlobe," a "scratched abrasion" on his "left ear top corner," and a "bruised area approximately 2 [inches in] diameter" in the center of the top of his head. J.A. 85. Escobar-Salmeron did not respond to the nurse's requests and attempts to take his vitals, assess him, and clean his bleeding lower lip, and he refused all medical care. J.A. 85. But while waiting to be transported from medical, Escobar-Salmeron complained on video[3] that "this bitch come over here and get me like that, hitting me for no reason, choking me for no reason, just because I forgot to put my, my hand on the wall, that's not right though." Hand-Held Video at 11:36–46.

In the months that followed, Escobar-Salmeron repeatedly sought care for injuries allegedly related to the incident:

---

[3] The Correctional Officers attached 35 exhibits to their motion to dismiss, or, in the alternative, for summary judgment. J.A. 3. Exhibit 10 was a DVD containing a hand-held video recording of Escobar-Salmeron's visit to medical, his transport to Housing Unit 4, and his strip search upon entering his new unit (hereinafter "Hand-Held Video"). *See id.*; *Escobar v. Moyer*, No. RDB-19-2717 (D. Md., PACER No. 15).

7

- On July 5, 2017, Escobar-Salmeron requested a sick call. He complained of shoulder and neck pain, which he said had begun 25 days prior and was caused by the altercation with the Correctional Officers. He also reported dizziness and blurred vision. His provider's notes referenced "neuro" and observed that Escobar-Salmeron had a lump on his head. J.A. 117, 210.

- On July 20, 2017, Escobar-Salmeron complained of left shoulder and lower back pain. His provider ordered an x-ray. J.A. 86–87.

- On October 26, 2017, Escobar-Salmeron requested a medication refill for the pain in his left shoulder. J.A. 112.

- On November 17, 2017, Escobar-Salmeron reported "being attacked by custody [sic] about 5.5 months ago" and "requested results from x-rays of [his] shoulder and lower back." J.A. 146. His provider indicated in his notes that the x-rays were "negative," presumably for fractures, and advised that Escobar-Salmeron should try range of motion exercises and hot showers. He prescribed an over-the-counter painkiller and told Escobar-Salmeron to return if his condition did not improve. J.A. 146.

- On December 25, 2017, Escobar-Salmeron requested a sick call for neck pain that began a "couple months ago." J.A. 109. He reported that "[t]he pain is too much that I can't even stand up or move my neck, and getting worse." J.A. 109. When Escobar-Salmeron was offered a neck and shoulder examination three days later, he refused, saying the issue had resolved. J.A. 98, 150.

- On January 1, 2018, Escobar-Salmeron requested a sick call for a runny nose and pain in his neck and head. J.A. 108.

- On January 27, 2018, Escobar-Salmeron requested a sick call for his neck and shoulder pain, which he said began seven months prior. In his request, he notes that he "put a sick call [in] like a month ago" and that he did not understand why he had not been called in. J.A. 107.

- On February 7, 2018, Escobar-Salmeron again requested a sick call, saying:

  > I put [in] 2 sick call[s] last month and you haven't call[ed] me[.] I don't know what you or the [Correctional Officers] got against me, but this is not a game. I am sick[.] I need to get something for my head[.] I [have] been having bad pain in my head and my shoulder.

J.A. 106.

## C. Internal Investigations

Escobar-Salmeron was later administratively charged with violations of inmate rules against (1) assault or battery on staff; (2) possession of a weapon; (3) interfering with and resisting the duties of staff; (4) disobeying a lawful direct order; (5) disrespect, vulgar language; and (6) misuse, alteration, tampering with, damaging or destruction of any property, tool, or equipment to include possession of any property in a hazardous condition. J.A. 63. He was found guilty of all but the vulgar language violation. J.A. 64.

The Intelligence and Investigative Division ("IID") conducted criminal investigations of both Escobar-Salmeron and the Correctional Officers in connection with the altercation. J.A. 250–84. The IID investigator reviewed the Correctional Officers' documentation of the event and Escobar-Salmeron's letter alleging that the Correctional

9

Officers assaulted him. J.A. 252–53. He reviewed Escobar-Salmeron's Officer of Health Services report from the day of the incident but reviewed no other health records. J.A. 253. He interviewed Escobar-Salmeron, Struss, and the Correctional Officers. J.A. 253–54. The investigator also requested that Escobar-Salmeron provide a more detailed written statement of his version of events. J.A. 253. Escobar-Salmeron declined, citing his limited English proficiency, but "signed [the investigator's] notes as factual." J.A. 253.

Ultimately, the investigator declared that "there was no evidence found to substantiate [Escobar-Salmeron's] claim that he was assaulted," and "[t]here was no incident of excessive force." J.A. 254. And so the IID cleared the Correctional Officers of any wrongdoing and found Escobar-Salmeron guilty of assault on a staff member. J.A. 369.

## D. Procedural History

Escobar-Salmeron filed a civil rights action based on the Day Room altercation and subsequent events. He later moved to voluntarily dismiss his claims, but soon thereafter reinstated them in this action. J.A. 6–8. In reinstating his complaint, Escobar-Salmeron did not pursue his original conditions of confinement and Administrative Remedy Procedure claims. J.A. 366. Rather, he limited this action to a 42 U.S.C. § 1983 excessive force claim and a state law claim. J.A. 9–13. He filed a motion for appointment of counsel soon after, which the district court denied. J.A. 15–21.

Moyer and the Correctional Officers moved to dismiss, or, in the alternative, for summary judgment, to which they attached 28 exhibits. J.A. 22, 159–346. Escobar-

10

Salmeron opposed the motion, citing Fed. R. Civ. P. 56(f)[4] to argue summary judgment should be denied because he had been unable to pursue discovery. The district court nonetheless dismissed Escobar-Salmeron's state law claim and his claims against Moyer before granting the Correctional Officers summary judgment on the remaining claims. *See Escobar*, 2020 WL 2061503, at *1, *4–5.

Escobar-Salmeron timely docketed his appeal with this court.[5] J.A. 378. In his informal brief, Escobar-Salmeron argued that, in light of factual disputes and evidence in the Correctional Officers' sole possession, summary judgment was improper on the record before the district court, and that the factual allegations in his verified complaint "were sufficient to state a violation of the Eighth Amendment." Appellant's Informal Br. (ECF No. 12) at 9, 13.[6] In their informal brief, the Correctional Officers responded that the grant of summary judgment was proper because there were no material facts in dispute, and Escobar-Salmeron had not pursued discovery while this action was pending at the district

---

[4] "Rule 56(d) was formerly Rule 56(f). . . . [T]he textual differences between current Rule 56(d) and former Rule 56(f) are purely stylistic. . . . Thus, case law developed under former Rule 56(f) remains controlling, and we cite to it where applicable." *Nieves-Romero v. United States*, 715 F.3d 375, 381 n.3 (1st Cir. 2013) (internal citations omitted). For clarity and uniformity's sake, we have replaced all references to "56(f)" with "56(d)."

[5] Earlier in the life of this appeal, we remanded this case to determine whether Escobar-Salmeron filed a timely notice of appeal. *See Escobar-Salmeron v. Moyer*, 847 F. App'x 203 (4th Cir. 2021) (No. 20-6853). On remand, the district court determined that Escobar-Salmeron's notice of appeal was timely delivered to prison officials for mailing and allowed his claims to proceed. *See Escobar-Salmeron v. Moyer*, No. CV RDB-19-2717, 2021 WL 4847266, at *2 (D. Md. Oct. 18, 2021).

[6] Citations to the parties' informal briefs refer to the page numbers generated by this court's CM/ECF system.

court.  Appellees' Informal Br. (ECF No. 35) at 1–2, 4–6.[7]  After this court appointed counsel, the parties filed their formal briefs.

In his formal brief, Escobar-Salmeron challenges the district court's failure to address his Rule 56(d) discovery request, its award of summary judgment to the Correctional Officers, its dismissal of his conditions of confinement and due process claims, and its denial of his motion to appoint counsel.  Finding the latter two challenges waived,[8] we address the former two challenges in turn.

## II. The Discovery Challenge

We begin by addressing Escobar-Salmeron's Rule 56(d) discovery challenge.

### A. Law

---

[7] On October 6, 2023, Escobar-Salmeron moved for default judgment because, he alleged, the Correctional Officers did not file their informal brief by the court's September 8, 2023, deadline.  Mot. for Default J. at 2.  In fact, the Correctional Officers did timely file their brief, but they served it on the incorrect address.  After receiving the motion, the Office of Staff Counsel asked the Clerk's Office to require the Correctional Officers to properly serve their brief on Escobar-Salmeron at his correct address; and the Clerk's Office issued a docket correction request.  The Correctional Officers filed their corrected certificate of service that same day.  Because the Correctional Officers promptly corrected their mistake, and "[w]e have repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits," we hereby deny the default judgment motion.  *See Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010) (collecting cases).

[8] "[U]nder Fourth Circuit rules, our review is limited to issues preserved in [the informal] brief."  *Jackson v. Lightsey*, 775 F.3d 170, 177 (4th Cir. 2014) (citing 4th Cir. Local R. 34(b)).  Because Escobar-Salmeron did not challenge the district court's denial of his motion to appoint counsel or its dismissal of his conditions of confinement and due process claims in his informal brief, we need not address them here.

12

We "review the decision to award summary judgment while discovery requests are still pending for abuse of discretion." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (internal citation omitted).

"[S]ummary judgment should only be granted 'after adequate time for discovery,' " *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "[W]hen a party lacks material facts necessary to combat a summary judgment motion, [he] may file an 'affidavit or declaration that, for specified reasons, [the party] cannot present facts essential to justify its opposition,' " referred to as a Rule 56(d) motion. *Id.* (quoting Fed. R. Civ. P. 56(d)).

Rule 56(d) motions "must be granted 'where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.' " *Id.* at 483–84 (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)). "[S]uch motions are 'broadly favored and should be liberally granted.' " *Id.* at 484 (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc)). "This is especially true in the context of pro se litigation," *Jenkins v. Woodard*, 109 F.4th 242, 251 (4th Cir. 2024) (citing *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)), particularly "when a case involves complex factual questions about intent and motive" and "the relevant facts are exclusively in the control of the opposing party." *Harrods Ltd.*, 302 F.3d at 247 (citations omitted).

The threshold showing to support a Rule 56(d) motion is low. For example, when a nonmovant bears no fault for its "little or no opportunity to conduct discovery, and when

13

fact-intensive issues, such as intent, are involved," a formal Rule 56(d) affidavit is not mandatory. *Id.* at 244. The nonmovant need only "adequately inform[] the district court that the motion is pre-mature and that more discovery is necessary." *Id.* (collecting cases).

Still, Rule 56(d) "motions may be denied . . . if 'the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.' " *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (quoting *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995)). And "vague assertions as to matters upon which the district court should have allowed discovery" cannot support a Rule 56(d) motion. *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995).

Circuits disagree as to whether a court must explicitly acknowledge a Rule 56(d) declaration. *Compare In re Avandia Mktg., Sales & Prod. Liab. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) ("A district court abuses its discretion when it grants summary judgment in favor of the moving party 'without even considering' a Rule 56(d) declaration filed by the nonmoving party."), *and Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1265 (10th Cir. 1984) ("[T]he trial judge must expressly rule on plaintiff's Rule [56(d)] affidavit and give specific reasons for the grant or denial thereof."), *with Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (holding that district courts need not "explicitly state[]" their decision on Rule 56(d) motions when granting summary judgment), *and Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*, 946 F.3d 660, 667 (5th Cir. 2019), *abrogated on other grounds by Ben E. Keith Co. v. Dining All., Inc.*, 80 F.4th

14

695 (5th Cir. 2023) ("[A] court does not abuse its discretion by entering summary judgment without expressly ruling on a pending Rule 56(d) motion.").

## B. Party Arguments

Escobar-Salmeron argues that the district court abused its discretion by granting summary judgment despite his Rule 56(d) declaration because he had not had the opportunity to discover essential information—the contents of the Day Room video—which was in the Correctional Officers' sole possession. He also argues that the district court's failure to explicitly address his declaration was itself error. Without addressing the latter point, the Correctional Officers argue that the district court properly granted summary judgment despite Escobar-Salmeron's purported Rule 56(d) declaration because any such "request" was deficient for several reasons. They point out that Escobar-Salmeron did not file a formal Rule 56(d) affidavit, request discovery, or move to compel or permit discovery, and that he did not identify the specific facts in dispute in the sole possession of the Correctional Officers and of which he was not already aware.

## C. Analysis

As a threshold matter, we agree with the Fifth and Ninth Circuits that district courts need not directly address an outstanding Rule 56(d) motion. Absent evidence of accidentally overlooking the motion, "[w]hen a district court enters a final judgment, it has implicitly denied any outstanding motions, even if the court does not explicitly deny a particular motion." *See Snider*, 946 F.3d at 667–68. Because Escobar-Salmeron has presented no evidence that the district court overlooked his Rule 56(d) declaration, we interpret the district court's silence as a denial.

15

Regarding Escobar-Salmeron's Rule 56(d) motion, we find his request procedurally insufficient. While Escobar-Salmeron need not have filed a formal Rule 56(d) affidavit, *see Harrods*, 302 F.3d at 244, our practice of construing pro se litigants' Rule 56(d) declarations "liberally" cannot remedy the deficiencies in Escobar-Salmeron's request. *See Jenkins*, 109 F.4th at 251 (quoting *Pledger*, 5 F.4th at 526).

Escobar-Salmeron failed to identify "additional evidence . . . creat[ing] genuine issue[s] of material fact sufficient to defeat summary judgment." *See Ingle*, 439 F.3d at 195 (quoting *Strag*, 55 F.3d at 954). True, he thrice referred to the Correctional Officers' alleged failure to comply with his discovery requests. *See* J.A. 351 ("The Court's grant of dismissal or summary judgment in favor of defendants' [sic] is premature where defendants' [sic] have refused to answer plaintiff's discovery request therein an effort to obtain additional evidence through the discovery process."); J.A. 360 ("[E]vidence sustaining plaintiff's allegations that he was unjustifiably and maliciously beaten by defendants' [sic] Holland and Arndt [is] in possession of defendants, whom to date, have ignored plaintiff's efforts to obtain responses to his repeated discovery requests."); J.A. 362 ("In accordance with Fed. R. Civ. P. [56(d)], defendants' dispositive motion for summary judgment should be denied where plaintiff, as the non-moving party, has not been able to pursue discovery, as those request [sic] made by plaintiff to date have been ignored and remain outstanding."). But merely alleging that the Correctional Officers had not been responsive to his discovery requests—without having requested discovery in the instant case—was insufficient to put the district court on notice of the discovery he sought. *See Nguyen*, 44 F.3d at 242.

16

This court's non-precedential decision in *Putney v. Likin*, 656 F. App'x 632 (4th Cir. 2016) (No. 14-6882), does not alter our analysis. There, Kory Putney, a prisoner at Western Correctional Institution ("WCI"), represented himself in a § 1983 suit alleging Eighth Amendment violations by officials at WCI. *Id.* at 634, 636. The officials moved to dismiss, or, in the alternative, for summary judgment. *Id.* at 636. Putney opposed the motion and attached a declaration seeking discovery before the entry of judgment. *Id.*

In an unpublished, per curiam opinion, this court found the district court's failure to address Putney's Rule 56(d) discovery request to be an abuse of discretion. *Id.* at 638–39. But Putney's declaration was significantly more detailed than Escobar-Salmeron's declaration. In his declaration, Putney "specifically stated that he had 'not yet had access to discovery' and that it was 'difficult for [him] to get documentation and declarations[,] especially from prisoners and prison officials from the[ ] Cumberland region, and prisoners who[ ] have been released.' " *Id.* at 638–39. And in his declaration, Putney clearly identified "nine pieces of evidence [he] need[ed] but [could not] obtain in order to mount an adequate opposition." *Id.* at 639. Putney's detailed declaration "adequately inform[ed] the district court that the motion [was] pre-mature and that more discovery [was] necessary." *See Harrods*, 302 F.3d at 244 (collecting cases). The declaration was therefore procedurally sufficient. *See Putney*, 656 F. App'x at 639.

In light of the declaration's procedural sufficiency; this court's policy of "broadly favor[ing]" and "liberally grant[ing]" Rule 56(d) motions, *see McCray*, 741 F.3d at 483–84; and the additional leeway allowed to pro se litigants, *see Jenkins*, 109 F.4th at 251; denying Putney's discovery request and granting summary judgment was an abuse of

17

discretion. But it was the denial signified by the court's silence—not the mere fact of the court's silence—that constituted abuse. *See Putney*, 656 F. App'x. at 640 ("For these reasons, the district court abused its discretion in failing to *grant* [Putney's] discovery request." (emphasis added)). And considering the stark contrast between Putney's clarity and Escobar-Salmeron's vagueness, *Putney* is factually inapposite and lacks persuasive value.

So, because Escobar-Salmeron's Rule 56(d) declaration contained only "[v]ague assertions as to matters upon which the district court should have allowed discovery," *see Nguyen*, 44 F.3d at 242, the district court did not abuse its discretion by granting summary judgment despite his Rule 56(d) declaration. *See Ingle*, 439 F.3d at 195.

## III. Excessive Force Claim

We turn next to the district court's grant of summary judgment. Finding genuine disputes of material fact remain, we vacate the district court's decision and remand for further proceedings.

### A. Law

"We review the district court's grant of summary judgment *de novo*, 'using the same standard applied by the district court.' " *Goodman*, 986 F.3d at 497 (quoting *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019)). "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact.' " *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "[A] few stray (and contradictory) statements in the record" do not necessarily "create a genuine issue of fact."

18

*Ricci v. DeStefano*, 557 U.S. 557, 591 (2009). But the district court may not itself "weigh[] the evidence or mak[e] credibility determinations." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732 (4th Cir. 2022) (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018)).

"An inmate's claim of excessive force involves both an objective and a subjective component." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). "The objective component measures the nature of the force employed, asking whether that force 'was sufficiently serious to establish a cause of action.' " *Id.* (quoting *Brooks*, 924 F.3d at 112). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Id.* (emphasis added) (quoting *Brooks*, 924 F.3d at 112). "[T]he subjective component, . . . [asks] whether the officers acted with a 'sufficiently culpable state of mind,' " that being "wantonness in the infliction of pain." *Id.*(citations omitted).

"Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). To determine an officer's state of mind, courts consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (internal quotation marks omitted) (quoting *Whitley*, 475 U.S. at 321).

19

In *Hudson v. McMillian*, 503 U.S. 1 (1992), "the Court aimed to shift the 'core judicial inquiry' from the extent of the injury to the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.' " *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (quoting *Hudson*, 503 U.S. at 7). As *Hudson* explained, "[t]he objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.' " 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

"When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Id.* at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today." *Id.* (first citing *Estelle*, 429 U.S. at 102; and then citing *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879)).

## B. Party Arguments

Escobar-Salmeron argues that because the Correctional Officers' affidavits and attachments to their motion conflicted with the contents of Escobar-Salmeron's complaint on the sequence of events and the force used, material facts were still in dispute. The Correctional Officers argue that because the circumstances supporting a need for force (the bite and the presence of the sheath) were not in dispute and because Escobar-Salmeron's "*de minimus* [sic]" injuries evince less force than he alleged, there was no genuine dispute of material fact. Appellees' Br. (ECF No. 73) at 22–23 [hereinafter "Resp. Br."] (emphasis

added).   Thus, because Escobar-Salmeron's story was "blatantly contradicted by the record, so that no reasonable jury could believe it," the district court properly granted summary judgment.  *Id.* at 23 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## C. Analysis

Viewing the record in the light most favorable to Escobar-Salmeron, we find that material facts remain in dispute.

Escobar-Salmeron's verified complaint, which retains its "evidentiary value as an affidavit at the summary judgment stage," *see Goodman*, 986 F.3d at 499, alleges that the Correctional Officers kicked, punched, and beat him, thereby injuring his neck, shoulders, head, and back.  J.A. 11.  These allegations are supported by the large, raised bruise on the top of Escobar-Salmeron's head, which was still observable by medical providers more than three weeks later, J.A. 117, 210, and by his months-long string of requests for x-rays, medication, and treatment for back and shoulder pain stemming from the altercation.  *See* J.A. 86–87, 112, 146, 108, 109, 107, 106.

Both Correctional Officers denied striking Escobar-Salmeron yet provided no alternative explanation for the bruise's source.  J.A. 223, 225.  Neither the Correctional Officers' predominant account of Arndt "plac[ing] his hand on [Escobar-Salmeron's] forehead and pull[ing] his face away from [Holland's] arm," J.A. 59, 189, 191, 194, 222, 225, nor their alternative retelling wherein Arndt "utilized a pressure point behind [Escobar-Salmeron's] ear," J.A. 34, 45, 172, 283, clarify the bruise's origin.  This difference of accounts is exactly the sort of "genuine dispute of material fact" that renders summary judgment inappropriate on an excessive force claim.

21

First, a reasonable jury could find that Escobar-Salmeron's injuries substantiate the "objective" component of his excessive force claim. *See Dean*, 984 F.3d at 302. Though the district court characterized Escobar-Salmeron's bruised head, bleeding ear, and shoulder and back pain as "minor," *see Escobar*, 2020 WL 2061503, at *5, these injuries do not establish that the Correctional Officers applied only *de minimis* force to Escobar-Salmeron. *See Dean*, 984 F.3d at 302; *see, e.g.*, *Hudson*, 503 U.S. at 10 ("[B]lows . . . which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes."); *Wilkins*, 559 U.S. at 35 (holding that force causing "bruised heel, lower back pain, increased blood pressure as well as migraine headaches and dizziness" could exceed *de minimis* threshold).

The district court's observation that Escobar-Salmeron "refused all medical care" for his injuries is not fully accurate and is irrelevant for our present purposes. *See Escobar*, 2020 WL 2061503, at *5. While he refused treatment in the immediate aftermath of the altercation, the record contains evidence that Escobar-Salmeron repeatedly sought medical care for his injuries. *See* J.A. 86–87, 112, 146, 108, 109, 107, 106. But even if Escobar-Salmeron had refused all care, it would not undermine our analysis. Although patients might refuse medical care because they perceive their injuries as minor, patients also may refuse medical care for a host of reasons. *See In re A.C.*, 573 A.2d 1235, 1244–47 (D.C. 1990) (collecting cases). Because the record does not disclose Escobar-Salmeron's reasons for initially refusing medical care, we decline to infer from his refusal alone that his injuries were caused by a *de minimis* amount of force.

22

Second, a reasonable jury could also find that the Correctional Officers used force "maliciously and sadistically." *See Dean*, 984 F.3d at 302 (quoting *Whitley*, 475 U.S. at 320–21). The district court improperly ruled out malice based on Escobar-Salmeron's supposedly "minor" injuries. *See Escobar*, 2020 WL 2061503, at *5. But the pertinent questions undergirding our malice analysis are not how much force officers use or how much injury they cause. Malice analysis interrogates the need for and proportionality of force, which cannot be measured by observing physical injuries alone. *See Dean,* 984 F.3d at 304–06 (evaluating proportionality of pepper spray usage based on circumstances of its use). When the district court foreclosed the possibility that the Correctional Officers' use of force was malicious based on Escobar-Salmeron's "minor" injuries, it improperly imposed a physical metric of malice in contravention of *Hudson*. *See* 503 U.S. at 9 (explaining that requiring "significant injury [be] evident" as evidence of malice 'would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury' ").

Furthermore, the fact that Escobar-Salmeron "bit [] Holland's arm during the struggle" does not conclusively prove that the force which caused Escobar-Salmeron's bruise was applied in "good faith." *See Escobar*, 2020 WL 2061503, at *5. Escobar-Salmeron alleges that the Correctional Officers began to kick and beat him before he bit Holland, J.A. 11, that "after he was handcuffed, [] Holland kicked him in the back of the head and face," J.A. 34, and that when the other officers arrived, they "beat [him] and messed up [his] shoulder and spine." J.A. 268.

Though the Correctional Officers assert that they did not kick or beat Escobar-Salmeron, it appears the district court concluded that whatever force caused the bruise was applied in response to the bite. The timing of the Correctional Officers' application of force bears on "the need for [its] application," "the relationship between the need and the amount of force that was used," and "the extent of any reasonably perceived threat that the application of force was intended to quell." *See Iko*, 535 F.3d at 239 (internal quotation marks omitted) (quoting *Whitley*, 475 U.S. at 321). That timing is yet another genuine dispute of a fact material to Escobar-Salmeron's excessive force claim.

The Correctional Officers also argue that the record "blatantly contradict[s]" Escobar-Salmeron's "conclusory assertions . . . that he complied with all the Correctional Officers' orders and that their use of force was unwarranted." Resp. Br. at 23–24. But Escobar-Salmeron disagrees with that claim and notes the lack of specific unrebutted evidence in the record that would permit the grant of summary judgment at this point. So, because material facts remain in dispute, Escobar-Salmeron met his burden at this stage, and the district court's grant of summary judgment was improper. *See Tolan*, 572 U.S. at 656–57.

## IV. Conclusion

We have repeatedly cautioned that summary judgment is "seldom appropriate" where, as here, a party's motive is a "decisive . . . element[] of [a] claim or defense." *See Ballinger v. N. Carolina Agr. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) (third alteration in original) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th

Cir. 1979)).  Because genuine disputes of material fact remain surrounding the Correctional Officers' use of force against Escobar-Salmeron, we vacate the district court's grant of summary judgment and remand the case to allow Escobar-Salmeron to renew his motion for counsel and proceed to trial.

*VACATED AND REMANDED*